UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CASE 1:16 CR 329 |
| Plaintiff, | ) | |
| | ) | JUDGE SARA LIOI |
| -vs- | ) | |
| | ) | |
| EDWARD R. HILLS, *et al.* | ) | **DEFENDANT SARI ALQSOUS'S BRIEF** |
| | ) | **IN RESPONSE TO BRIEF OF THE** |
| Defendants. | ) | **UNITED STATES RE: FORFEITURE** |
| | ) | **AND PROPOSED VERDICT FORM** |

Defendant Sari Alqsous hereby submits this brief in response to the Government's January 29, 2019 brief regarding the criminal forfeiture law applicable to Dr. Alqsous's forfeiture hearing. Specifically, Dr. Alqsous wants to make the Court aware of additional case law relevant to the forfeiture determination and summarize his position regarding the Government's attempts to seize the entirety of the $88,895 seized from his residence at 1422 E. 15th Street on September 29, 2015.

This is not a complicated matter. Despite having years to investigate this case and calling over 40 witnesses at trial, the Government presented no evidence that Dr. Alqsous used any cash funds from his home to pay any bribe to Dr. Hills. There is absolutely nothing in the record that indicates that Dr. Alqsous kept a "slush fund" or "cash hoard" at his residence at 1422 E. 15th Street, Cleveland, Ohio in order to pay cash bribes to Edward Hills. For this reason (and many others below), this Court must return a verdict in favor of Dr. Alqsous with regard to the $88,895 seized from his home on September 29, 2015.

**STATEMENT OF THE FACTS**

**I.    Count 1 and Count 2 control the operative period for any cash for which the Government now seeks forfeiture.**

The Government seeks forfeiture, pursuant to 18 U.S.C. §1963(a)(2)(D), of $88,895 in U.S. currency seized from Dr. Alqsous's residence during the execution of a search warrant. The Government alleges that the currency "afford[ed] a source of influence over" the RICO enterprise because the currency constituted Dr. Alqsous's "cash hoard," from which he could make payments in relation to the RICO enterprise." (*Gov't. Brf.*, Dkt. 434, at 3.) The Government argues that this "cash hoard" served as Dr. Alqsous's "slush fund to facilitate the payments that he was making to [Dr.] Hills." (Dkt. 387, at 8896.)

The cash payments at issue here relate to the Conspiracy to Commit Hobbs Act Bribery outlined in Count 2 of the Indictment. That conspiracy, per the Indictment and evidence at trial, commenced in January 2009 and ended in December 2014, when Dr. Hills left MetroHealth. (*Ind.*, Dkt. 1, at ¶¶ 17, 104.) In contrast, the RICO Conspiracy stretches from January 2008 through April 2016 and describes the enterprise as "* * *, MetroHealth constituted an "Enterprise" as that term is defined in Title 18, United States Code, Section 1961(4), * * * ." (*Id.* at ¶¶ 50, 55.)

The Government explained its "slush fund" theory at the hearing addressing Dr. Alqsous's Motion to Return Property, stating:

> "In the indictment, the Government sets forth a series of texts where [Dr.] Alqsous is texting to [Dr.] Hills. 'I have a thing for you.' 'I have something for you.' Things of that sort.
>
> And then within the next day or so, per the indictment, [Dr.] Hills makes a deposit. Be it, 2,000, 3,000, or what have you.
>
> And also in the indictment, there is references of [Dr.] Alqsous making monetary payments to [Dr.] Hills. And specifically the indictment charges

>that, you know, gave [Dr.] Hills things of value, including cash, checks, a luxury briefcase, a large-screen television, apartment and hotel rentals, airline flights and flight upgrades, loans that were never repaid, and other things of value.

>And the indictment charges that in return for these items, [Dr.] Hills made favorable official actions—or took favorable official actions."

(Dkt. 387, at 8896.)

There were no allegations in the Indictment or evidence at trial that Dr. Alqsous made any cash payments to Dr. Hills *after* he resigned from MetroHealth in December 2014. In fact, there is no reference to any criminal activity in 2015 and 2016 beyond those specific paragraphs of the Indictment and the trial testimony related to Dr. Alqsous and Dr. Al-Madani's alleged obstruction of justice. (Dkt. 1, at ¶¶ 329, 340, 359-361.) Accordingly, it is only those payments allegedly made during the time period of from January 2009 through December 2014 that are at issue in this forfeiture trial.

The Government executed a search warrant at 1422 E. 15th Street on September 29, 2015. As the Court heard during the motions hearing and the trial, 1422 E. 15th Street is the address of the home that Dr. Alqsous's shared with his fiancé, Dr. Jennifer DiPiero, another dentist.

## II. The September 29, 2015 search of Dr. Alqsous and Dr. DiPiero's home and the cash seized during the execution of the warrant.

The Government did not present any evidence that any of the cash seized on September 29, 2015, came from any illegal activity of which Dr. Alqsous was convicted. Rather, the Government is proceeding under a "source of influence" argument, rather than claiming that any cash seized on September 29, 2015 were "proceeds" of any criminal activity pursuant to the general forfeiture statute governing counts 2-29. (*Gov't Brf.*, Dkt. 434, at 1.)

3

That is why the timing of the allegations against Dr. Alqsous becomes so important. Because, simply put, the cash seized by the Government came from legitimate sources, much of which was accrued *after* Dr. Hills resigned from MetroHealth in December 2014 when the Hobbs Act conspiracy concluded.

Reviewing the photographs of the search warrant, it is readily apparent that both Dr. Alqsous and Dr. DiPiero kept cash in their home, most of it located in a safe.[1] The cash identified at trial was generally organized as follows:

1. Envelopes, each containing cash, and payments identified by a receipt book. Dr. Alqsous had owned a rental property and had a tenant. Dkt. 403, p. 12971. Chris King, Dr. Alqsous's tenant, made payments to Dr. Alqsous beginning on December 20, 2013. Mr. King made his last payment on October 1, 2015. Each $2,100 rental payment was accompanied by a receipt prepared by Dr. Alqsous. See Alqsous Exs. NC, NA and portions of tax returns.

2. $5,700 belonging to Dr. DiPiero.

3. $1,200-$1,400 in one-dollar bills located in a bureau drawer (with a ruler used to measure the length of the cash) consisting of Medicaid co-pays of $3.00 each made by Noble Dental Clinic patients. S.A. Spielmaker testified that "every single bill in that stack of money was a dollar bill," and he had no idea how long that cash had been there. (Dkt. 403, pp. 12977-12979.)

4. Cash that came from the business operations of Noble Dental Clinic and overseas trips that was seized from elsewhere in Dr. Alqsous's home. Some, but not all of these funds are depicted photographs taken when the search warrant was executed on September 29, 2015. Dr. Alqsous purchased Noble Dental Clinic with Dr. Al-Madani and they incorporated Noble Dental Clinic in April 2013. (Dkt. 403, p. 12969.)

Paragraphs 109 through 134 of the Indictment detail the cash payments allegedly made to Dr. Hills. (Dkt. 1, at ¶¶ 109-134.) The Government's Sentencing Memorandum, in relevant part, identifies deposits or texts that it contends resulted in cash payments allegedly made to Dr. Hills:

---

[1] The Government and Dr. Alqsous have agreed to exchange exhibits for the forfeiture trial on Monday, February 11, 2019. Dr. Alqsous will file his exhibits with the Court at that time.

| EXHIBIT | DATE | DESCRIPTION | TOTAL |
|---|---|---|---|
| **4404-D** | **2012.12.30** | **$1,000 deposit to Hills' Account** | **$1,000.00** |
| **4410-D** | **2012.02.03** | **$3,000 deposit to Hills' Account** | **$3,000.00** |
| **4414-D** | **2012.04.23** | **$1,000 deposit to Hills' Account** | **$1,000.00** |
| **4421-S** | **2012.07.31** | **Text Message Hills re: Mac Book** | **$2,000.00** |
| **4426-D** | **2012.08.10** | **$1180 deposit to Hills' Account** | **$1180.00** |
| **4427-D** | **2012.08.15** | **$3,000 deposit to Hills' Account** | **$3,000.00** |
| **4428-D** | **2012.09.05** | **$2,500 deposit to Hills' Account** | **$2,500.00** |
| **4429-D** | **2012.09.18** | **$1,200 deposit to Hills' Account** | **$1,200.00** |
| **4430-D** | **2012.10.09** | **$2,000 deposit to Hills' Account** | **$2,000.00** |
| **4441-D** | **2013.03.25** | **$1,000 deposit to Hills' Account** | **$1,000.00** |
| 4446-D | 2013.06.11 | $1,000 deposit to Hills' Account | $1,000.00 |
| 4448-S | 2013.10.07 | Text Message to Elrawy and [Al-Madani] re Hills Birthday | $3,000.00 ($1,000 each) |
| *4519* | *2013.09.06* | *Deposit by Hills into acct. 3342, (Ind., at ¶ 134(a))* | *$2,000.00* |
| *4521* | *2014.02.20* | *Deposit by Hills into acct. 3342 (Ind., at ¶ 134(b))* | *$1,000.00* |
| *4522* | *2014.03.04* | *Deposit by Hills into acct. 8152 (Ind., at ¶ 134(c))* | *$1,000.00* |
| *4523* | *2014.09.18* | *Deposit by Hills into acct. 3342 (Ind., at ¶ 134(d))* | *$1,900.000* |

(*Govt.'s Sentencing Memo.*, at 11-12; *Ind.* at ¶ 134(a)-(d).) The deposits in **Bold** predate Dr. Alqsous's purchase of Noble Dental Clinic or Chris King's rental of 1426 E. 15th Street, Cleveland, Ohio. Moreover, the Indictment and the Government's sentencing chart only detail $6,900.00 in cash payments to Dr. Hill in 2013 and 2014 after Dr. Alqsous purchased Noble Dental Clinic with Dr. Al-Madani and rented the property to Chris King. In 2015 and 2016, no cash payments to Dr. Hills are identified. For two of those payments in *italics* above in September 2013 and 2014, respectively, Dr. Alqsous was out of the country. *See* Trial Exhibits KG and KH.

While the Government indicates that Hussein Elrawy and Joyce Kennedy witnessed cash payments being made to Dr. Alqsous, neither attributed those payments to a "cash hoard" or "slush fund" located at Dr. Alqsous's residence. Joyce Kennedy testified to allegedly seeing cash delivered in an envelope from Dr. Alqsous to Dr. Hills on one occasion in April or May 2012. (Dkt. 401, at 12518, 12611). While she claimed to see other white envelopes on three-fourths of the occasions she had dinner with the defendants, she did not see other cash, identify

5

when this other cash was provided to Dr. Hills, or identify who made any specific payment at these dinners.  She said "[i]t could be any combination of those three individuals" because "sometimes we would just have dinner with Hussein, or just Sari, or just Al-Madini, or just Al-Madani or Sari, or Sari and Al-Madani, or like that."  (*Id.* at 12518.)

Dr. Elrawy also claimed to have seen cash given to Dr. Hills, but, at trial, he did not identify when this occurred.  But, based on the Government's theory in Count 2, these exchanges had to occur before December 2014.  (*Ind.*, Dkt. 1, at ¶¶ 17, 104.)

Also, neither Joyce Kennedy nor Dr. Elrawy attributed these cash payments as coming from rental payments or being the proceeds of Noble Dental Clinic.  (*See Govt.'s Sentencing Memo.*, Dkt. 447, at fn. 9.)  Lastly, regardless of any statements attributed to Dr. Alqsous, at no point does he reference a "cash hoard" or "slush fund" used to pay cash to Dr. Hills or indicate that any alleged cash paid to Dr. Hills came from the proceeds of his rental unit, Nobel Dental Clinic, or any overseas trips he may have taken.

In fact, there is no evidence that any cash from Noble Dental Clinic was ever provided to Dr. Hills.  The Government's theory has always been that Dr. Hills received checks from Noble Dental Clinic "containing false notations that they were for 'consultation fees' or 'professional fees' * * *" identifying checks written to Dr. Hills from January 7, 2014 through July 6, 2014 as part of the alleged referral scheme.  (*Ind.*, Dkt. 1, at ¶ 325(a)-(g).)  Simply put, no witness or other evidence at trial linked any alleged cash payment made to Dr. Hills with the funds seized from Dr. Alqsous's home on September 29, 2015 that can be attributed to funds from Noble Dental Clinic.

## **LAW AND ARGUMENT**

**I.     The cash seized by the Government did not afford "a source of influence over" the RICO enterprise.**

The Government seeks forfeiture of $88,895 in cash under the RICO statute, which calls for forfeiture of any "property or contractual right of any kind affording a source of influence over" the RICO enterprise. 18 U.S.C. § 1963(a)(2)(D). Courts have interpreted the "source of influence" language to mean "property that is actually tainted" by the criminal enterprise. *United States v. Angiulo*, 897 F.2d 1169, 1212 (1st Cir. 1990); *see United States v. McKeithen*, 822 F.2d 310, 315 (2d Cir. 1987) (only "that specific portion of a defendant's property affording a source of influence over the enterprise" is forfeitable).[2] That is because the purpose of "these forfeitures is to recover all of the racketeer's ill-gotten gains but not to seize legitimately acquired property." *United States v. Porcelli*, 865 F.2d 1352, 1365 (2d Cir. 1989) (directing district court to consider proportionality on remand because of evidence that defendant's "business expanded and prospered as a result of his hard work and business acumen," not merely his criminal activities); *see McKeithen*, 822 F.2d at 315 (reversing judgment of forfeiture of defendant's entire interest in real estate where jury had found that only a portion of the interest afforded a source of influence over the illegal enterprise). Thus, the court must "assess forfeiture against a defendant only when 'the facts support of a finding of a sufficient **nexus** between the property to be forfeited and the RICO violation.'" *United States v. Bohn*, 281 Fed. Appx. 430, 443 (6th Cir. 2008) (emphasis in original).

---

[2] The *McKeithen* case involved a "continuing criminal enterprise" and forfeiture under 21 U.S.C. § 848(a)(2), now 21 U.S.C. § 853(a)(3), which authorizes forfeiture of "property or contractual rights affording a source of control over, the continuing criminal enterprise." That "affording a source of influence" language is substantively identical to the RICO forfeiture provision at issue here (18 U.S.C. § 1963(a)(2)(D)). Moreover, courts have looked to precedent interpreting Section 853 to construe the RICO forfeiture provision. *See, e.g., Angiulo*, 897 F.2d at 1212.

The Government cites three non-RICO forfeiture cases for "the proposition that a defendant's 'bank'/cash hoard may be forfeited as facilitating property," while acknowledging they are distinguishable because they were "decided in the drug trafficking context." (Gov't Brf., at 3.)  Not only are they factually distinguishable, they did not involve the RICO forfeiture statute or rely on any statutory provision concerning property that purportedly "afforded a source of influence over" a criminal enterprise.  In *United States v. McKinney*, N.D. Ohio Case No. 4:15-cr-136 (Boyko, J.), the Government sought and obtained forfeiture—under 21 U.S.C. §§ 853(a)(2) as property the defendant used or intended to use to facilitate the crime—of cash seized at the home of a heroin dealer, along with a money judgment and substitute property.  In *United States v. Gaskin*, the Government seized almost $20,000 in cash from the defendant drug dealer's person and vehicle *incident to arrest*, which occurred at a controlled drug delivery "where he expected to take delivery of a large quantity of marijuana," and it sought forfeiture under 21 U.S.C. § 853(a)(2), which authorizes forfeiture of "property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of," the crime charged. 364 F.3d 438, 449, 462 (2d Cir. 2004).  In *United States v. Herder*, the Government seized $1,223 in currency from the defendant *at the time of his arrest* as "proceeds of drug trafficking" because it "was folded and held in a manner indicative of its use in a drug transaction," and the defendant also "was in possession of a quantity of drugs for which he was subsequently convicted of possessing with the intent to distribute."  594 F.3d 352, 364-65 (4th Cir. 2010). This case is nothing like those cases as the sources of funds in those cases were clearly illegitimate and had a close nexus to the charged crimes.  The Court should afford them little weight.

The Court should instead consider two more analogous cases: *Bohn* and *Angiulo*. In *Bohn*, the Government sought the forfeiture of $22.4 million ("the amount in wire transfers that were made from [the offending entity's] account . . . to accounts in the name of [the offending entity] at four other banks") to be satisfied from the defendant's interest in several other entities. 281 Fed. Appx. at 442. The Government contended that "because the entities named in the preliminary order of forfeiture . . . were all used to further [the] criminal enterprise," the defendant's "interest in each of those entities' assets is subject to forfeiture." *Id.* at 444. The court rejected that contention, reasoning that the Government's view was "wholly inadequate to support the forfeiture of specific property." *Id.* The Sixth Circuit reasoned that there was no evidence that any "funds traceable to" the offending company were ever deposited into the accounts listed in the indictment. *Id.* The court further reasoned that there was no evidence that the accounts were in the defendant's name, that he ever deposited money into the accounts, or that he had any interest in the accounts. *Id.* Thus, the court reversed the order of forfeiture, concluding that the property's "nexus to the RICO violation" was "a matter of pure speculation." *Id.*

In *Angiulo*, the Government sought forfeiture under the RICO statute of $372,601 seized from the headquarters of a mafia organization and the adjacent apartment of one of the defendants, arguing that the cash constituted proceeds of the illegal racketeering enterprise and afforded a source of influence over the enterprise. 897 F.2d at 1211. The jury "found that 50% of the cash . . . constituted proceeds or profits" and also "that the cash afforded a source of influence over the enterprise." *Id.* "Due to the latter determination, 100% of the cash was ordered forfeited." *Id.* The court of appeals "reverse[d] that part of the judgment forfeiting the cash under a source of influence theory" and held that "a proportional forfeiture theory" should

have been applied and that forfeiture of "only that percentage of the cash that actually *was used to further the affairs of the enterprise*" should have been permitted. *Id.* at 1211-12 (emphasis added).

**II.     Reviewing the evidence does not support the Government's conclusion that Dr. Alqsous used the cash located in his home as a "slush fund" that afforded him a source of influence over the RICO conspiracy**

Looking at this material, some points readily jump out and the evidence does not support the Government's assertions.

First, no witness identified the cash seized from Dr. Alqsous's home on September 29, 2015 as the "source" of any cash payments allegedly made to Dr. Hills. There was no testimony about Dr. Alqsous going to his "cash hoard" or "slush fund" to retrieve money that would be paid to Dr. Hills.

Second, Dr. Alqsous had two legitimate businesses—outside the RICO enterprise—which explain the cash present in his home. As noted above, he had a tenant who often paid his monthly rent in cash. And after purchasing Noble Dental Clinic in May 2013, patients occasionally paid for treatments or co-pays in cash. Importantly, the timing of these payments was well after most of the alleged cash bribes were paid. Dr. Alqsous also returned with cash when he traveled.

Third, as seen above, a significant portion of the funds identified came into Dr. Alqsous's possession *after* Dr. Hills left MetroHealth in December 2014. That is not to say that the other funds are somehow linked to the alleged criminal activity; rather, no one can identify when the remaining funds came into Dr. Alqsous's possession.

Fourth, Dr. DiPiero owned approximately $5,700 of the seized cash. Simply put, some of the cash in the home belonged to her.

10

Fifth, with regard to the $1,200 to $1,400 in cash located in the bureau, no witness testified that Dr. Alqsous provided Dr. Hills cash consisting of one-dollar bills.

Sixth, the Government identified the Enterprise as MetroHealth. There is no evidence that any cash allegedly paid to Dr. Hills was used in the conspiracy to conduct and participate in the affairs of the enterprise, defined as MetroHealth. (*Ind.*, at ¶55.) No witness attributed any cash payment to any specific act or showed how any cash payment to Dr. Hills *was used to further the affairs of the enterprise*. *Angiulo*, 897 F.2d at 1211-1212. Stated another way, there was no evidence that any cash payment from Dr. Alqsous that allegedly went to Dr. Hills resulted in the enterprise—MetroHealth—taking any action.

Seventh, the funds that were seized from Dr. Alqsous's home do not constitute the "source of influence" at issue. Rather, it is the cash that were allegedly *paid* to Dr. Hills in increments of $1,000 or $2,000 that serve as the "source of influence." Even under the Government's theory, the $88,895 seized from Dr. Alqsous's home *was not used* in any criminal activity. Accordingly, any cash that could be forfeited would have been that which was allegedly paid to Dr. Hills, rather than the untainted funds sitting in Dr. Alqsous's home. And, since the Government is not seeking to substitute property for the cash allegedly paid to Dr. Hills, it cannot seize any portion of the $88,895 as substitute property.

Eighth, there is no evidence that Dr. Alqsous supplied any cash that was part of the alleged "slush fund" in his home to any of his co-conspirators so that they could supply it to Dr. Hills.

Ninth, the Government has always argued that Dr. Hills was paid bogus consulting fees by Dr. Alqsous and Dr. Al-Madani via Noble Dental Clinic checks. No witness ever testified

11

that any of the cash seized from Dr. Alqsous's home that came from the business operations of Noble Dental Clinic was part of the "slush fund" for cash payments to Dr. Hills.

Tenth, the Government cannot satisfy its burden of demonstrating that Dr. Alqsous would not have acquired or maintained the cash without the criminal enterprise. Unlike *McKinney* (where the defendant was a drug dealer and the Government also sought a money judgment and substitute property), Dr. Alqsous is not convicted of any drug trafficking offense, and the indictment includes no provision seeking substitute property or a money judgment in the RICO forfeiture.[3] The Government has no evidence that any of the funds seized from Dr. Alqsous's home on September 29, 2015 constituted a "slush fund" that could be characterized as a "source of influence" over the enterprise. Rather, as noted above, the cash undisputedly came from legitimate sources, namely rental income and Noble Dental Clinic.

Eleventh, the cash seized from Dr. Alqsous's residence was not tainted by the RICO enterprise; it was legitimately obtained through, for example, rent payments and dental procedures and co-pays and the residue of trips overseas. Looking at the photographs can lead to no other conclusion, and the Government does not challenge this assertion. Importantly, many of the envelopes containing cash designate the date when it was obtained by Dr. Alqsous. As such, it is easy to parcel out the cash portions that Dr. Alqsous obtained in 2015, *beyond* the completion in December 2014 of the Hobbs Act Conspiracy. Those portions could not have afforded Dr. Alqsous a source of influence over a conspiracy that had since ended.

Lastly, as *Angiulo* illustrates, the forfeiture sought is not an all-or-nothing proposition. If the Court finds that only a portion of the $88,895 was a source of influence related to the RICO conspiracy, it should require forfeiture of just that portion. For this reason, the forfeiture verdict

---

[3] The Government is not seeking a money judgment. (Dkt. 411, at 15090.)

form submitted by the Government (Gov't Brf., at 10; Dkt. 434-1) is inaccurate and should be revised to reflect that the Court need not find that the entire $88,895 is forfeitable if it finds that only a portion afforded a source of influence over the RICO enterprise. Dr. Alqsous respectfully submits a proposed verdict form, which is appended to this brief.

### III. The burden of proof should be beyond a reasonable doubt.

Dr. Alqsous acknowledges that, under settled Sixth Circuit precedent, "[t]he government must prove forfeiture by a preponderance of the evidence." *United States v. Jones*, 502 F.3d 388, 391 (6th Cir. 2007); Gov't Brf., at 6-7. Nonetheless, Dr. Alqsous contends that the correct burden of proof is beyond a reasonable doubt as determined by the Third Circuit. *See United States v. Pelullo*, 14 F.3d 881, 906 (3d Cir. 1994) (concluding that the burden of proof in a RICO forfeiture proceeding is beyond a reasonable doubt).

### IV. Allowing the forfeiture of $88,895 for the minimal cash payments allegedly made to Dr. Hills would violate the Eighth Amendment to the United States Constitution.

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. AMEND. VIII. The Supreme Court has recognized that forfeitures are "fines" under the Eighth Amendment if punitive, and the Sixth Circuit recognizes forfeitures as punitive. *See United States v. Bajakajian*, 524 U.S. 321, 328 (1998); *United States v. Boring,* 557 F.3d 707, 714 (6th Cir. 2009). "[T]he test for the excessiveness of a punitive forfeiture involves solely a proportionality determination," and "a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *Bajakajian*, 524 U.S. at 333-334; *see United States v. Corrado*, 227 F.3d 543, 552 (6th Cir. 2000) ("Though the statute appears to require total forfeiture of illegal proceeds, courts can reduce the forfeiture to make it proportional to the seriousness of the offense so as not to violate the Eighth Amendment prohibition against 'cruel and unusual punishment' or 'excessive

fines.'"). A proportionality determination depends on many "factors including the nature of the offense, the connection to other illegal activities, the source and likely use of the funds, whether his conduct fit into the class the statute was designed to cover (money launderers, tax evaders, terrorism financiers, or drug traffickers), and the potential fine under the advisory guideline range." *United States v. Ely*, 468 F.3d 399, 403 (6th Cir. 2006).

In *Bajakajian*,[4] the defendant was convicted of failing to report his transportation of more than $10,000 out of the country. *Id.* at 324. He told a customs inspector that he had $8,000 and his wife had $7,000, but that his family had no other currency. *Id.* A search uncovered more than $350,000 in currency that he failed to declare. *Id.* The currency was seized. After the defendant was convicted, the district court—despite the statute requiring forfeiture of the entire amount seized—ordered forfeiture of $15,000. *Id.* at 326. The Court of Appeals affirmed and held that the statute was unconstitutional. *Id.* at 327. The Supreme Court affirmed, holding that "the full forfeiture of respondent's currency would violate the Excessive Fines Clause" because it "would be grossly disproportional to the gravity of his offense." *Id.* at 324, 344. In doing so, the Supreme Court noted that the "money was the proceeds of legal activity." *Id.* at 338.

Here, the Government does not contend that Dr. Alqsous paid anything approaching $88,895 in cash bribes. Indeed, the evidence demonstrates that this cash came from lawful sources, namely rent payments, payments for legitimate dental services and was the remainder of foreign trips. Requiring forfeiture of $88,895 in cash would be disproportional to the offense for which Dr. Alqsous was convicted, and this Court should decline to order its forfeiture.

---

[4] After *Bajakajian*, Congress responded by defining a new crime of "bulk cash smuggling" that authorized forfeiture of cash smuggled outside the United States, emphasizing that it believed such smuggling was "a very serious offense." *United States v. Jose*, 499 F.3d 105, 111 (1st Cir. 2007). In doing so, Congress intended to emphasize the gravity of that specific offense, but it did not change the substance of the proportionality analysis under the Eighth Amendment. *See id.*

14

## **CONCLUSION**

For all the foregoing reasons and those to be presented at the sentencing hearing, the Court should not order the forfeiture of the $88,895 seized from Dr. Alqsous's residence.  Dr. Alqsous respectfully requests that this Court incorporate its forfeiture finding into the Court's final judgment.

Date: February 6, 2019  Respectfully Submitted,

/s/ John R. Mitchell
John R. Mitchell (#0066759)
Thompson Hine LLP
3900 Key Center
127 Public Square
Cleveland, OH 44114-1291
John.Mitchell@ThompsonHine.com
O: 216.566.5500
F: 216.566-5800

*Attorney for Defendant Sari Alqsous*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | CASE 1:16 CR 329 |
| Plaintiff, ) | |
| ) | JUDGE SARA LIOI |
| -vs- ) | |
| ) | |
| EDWARD R. HILLS, *et al.* ) | |
| ) | **FORFEITURE VERDICT** |
| Defendants. ) | |
| ) | |

On July 27 2018, a jury trial as to Defendant Sari Alqsous was concluded and, *inter alia*, a guilty verdict was returned as to Count 1 of the Indictment, which charged RICO conspiracy in violation of 18 U.S.C. § 1962(d).  With respect to forfeiture under 18 U.S.C. § 1963(a)(2)(D), the Court now makes the following determination regarding **$88,895 in U.S. Currency seized at 1422 East 15th Street, Cleveland, Ohio, on September 29, 2015.**

Did any portion of this property afford defendant Alqsous a "source of influence" over the RICO enterprise charged in Count 1 of the Indictment?

No: _____     Yes: _____

If "yes," how much of the $88,895 in cash afforded defendant Alqsous a source of influence over the RICO enterprise charged in Count 1 of the Indictment?

$_____._____

**SO ORDERED** this \_\_\_\_ day of February, 2019.

_____
Sara Lioi, U.S. District Judge

## **CERTIFICATE OF SERVICE**

A copy of the foregoing DEFENDANT SARI ALQSOUS'S BRIEF IN RESPONSE TO BRIEF OF THE UNITED STATES RE: FORFEITURE was served through the Court's electronic filing system this 6th day of February, 2019.  Notice of this filing will be sent to the parties by operation of the Court's electronic filing system.

       /s/ John R. Mitchell
       *Attorney for Defendant Sari Alqsous*