IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:16CR329 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | |
| | ) | |
| SARI ALQSOUS, | ) | GOVERNMENT'S RESPONSE TO |
| | ) | DEFENDANT ALQSOUS'S |
| Defendant. | ) | SUPPLEMENTATL SENTENCING |
| | ) | MEMORANDUM [R. 478] |

Now comes the United States, by and through its counsel, Justin E. Herdman, United States Attorney, and Om M. Kakani, Assistant United States Attorney, and hereby files this brief response to Defendant Sari Alqsous's *Supplemental Sentencing Memorandum*. [R. 478, PageID 19806].

Defendant Alqsous's filing, much like his initial sentencing memorandum, is an extended and untimely attempt to re-litigate the trial that resulted in his conviction on 16 felony offenses, including RICO, Hobbs Act and Honest Services and Money and Property Wire Fraud Conspiracies. To the extent that he advances arguments that would contradict the jury's unanimous convictions against him, this Court has already ruled against him as the jury's verdict is supported by the evidence. For the most part, the government rests on the voluminous

briefings in this matter and the trial record, and provides the following brief response to Defendant Alqsous's *Supplement* to clarify those issues Alqsous continues to deny.

### **Defendant Alqsous Continues to Mistake "Objects" with "Means"**

Defendant Alqsous distorts government counsel's closing arguments for the proposition that he did not engage in a *quid pro quo* scheme with Defendant Hills. Putting aside his conviction and the fact that the government's arguments are not evidence, Alqsous relies on a misquoted portion of the government's closing argument concerning Defendant Hills's use of a "black box" to carry out the incentive portion of the Hobbs scheme. Mistaking this metaphor for an all-encompassing escape clause, Alqsous fails to recognize or acknowledge that the government's "black box" argument referenced Hills's actual control over and the mechanics of the incentive program (and not the flex-time decision or Nassar hire, which were not conducted in a "black box"). This "black box" is not part of the *quid pro quo*, the increased incentives are.

Instead, the "black box" was a reference to *how* (i.e., a manner and means) he was able to carry out the Hobbs scheme and obtain its objects. The actual *objects* of the conspiracy or *quid pro quo* remained the same – to increase the incentives, obtain part-time hours for full-time pay, to hire Dr. Nassar, and prevent detection – and those objects were proven at length at trial. Nothing about *how* Hills was able to accomplish the objects of the conspiracy changes those actual objects. Nor does it change Alqsous's expectations of his return on investment. The jury understood this, even if Alqsous cannot or refuses to, and the Court should ignore Alqsous repeated arguments mistaking the means of the scheme for its objects.

### **Alqsous Misconstrues *Terry***

Alqsous contorts the Sixth Circuit's decision in *United States v. Terry*, 707 F.3d 607 (6th Cir. 2013) by ignoring the very premise for which it stands. Instead of acknowledging that the

stream of benefits in return for official acts as the situation arises theory of bribery has long been accepted by the Sixth Circuit, *id.* at 612, and several other courts of appeals,[1] Alqsous confusingly discusses wholly irrelevant and inapplicable sections of the Guidelines. He does so by continuing to disregard that he was specifically convicted of 18 U.S.C. §§ 1951(a), 1346 and 1349, all of which point to Guidelines Section 2C1.1.[2] He further completely ignores his own numerous, **explicit** text messages referencing his gains in return for providing Hills things of value. *See* GX 4217.2-S (D1 bonuses for 75 inch television, "you always take care of us"); GX 4300-2 (incentive payments in return for Perry Payne apartment); GX 4436-S (raises in return for Louis Vuitton briefcase).

Alqsous also appears to argue that *Terry*, where the *quid pro quo* arrangements were explicit (like Alqsous's text messages), requires all *quid pro quo* arrangements be spelled out as "straight up" requests. This is not the law. In the Sixth Circuit, a Hobbs Act prosecution for extortion under color of official right – in a non-campaign contribution context such as this one – must simply demonstrate the existence of a *quid pro quo* to be successful. *See United States v. Collins*, 78 F.3d 1021, 1035 (6th Cir. 1996). However, the *quid pro quo* need neither actually be fulfilled, ***nor explicitly stated, as long as it is intended by the parties***. *Id*. A "simple wink and a

---

[1] *See*, *e.g.*, *United States* v. *McDonough*, 727 F.3d 143 (1st Cir. 2013); *United States* v. *Rosen*, 716 F.3d 691 (2nd Cir. 2013); *United States* v. *Coyne*, 4 F.3d 100 (2nd Cir. 1993); *United States* v. *Bradley*, 173 F.3d 225 (3d Cir. 1999); *United States* v. *Jennings*, 160 F.3d 1006 (4th Cir. 1998); *United States* v. *Whitfield*, 590 F.3d 325 (5th Cir 2009); *Ryan* v. *United States*, 688 F.3d 845, 852 (7th Cir.2012); *United States* v. *Gee*, 432 F.3d 713 (7th Cir. 2005); *United States* v. *Kincaid-Chauncey*, 556 F.3d 923 (9th Cir. 2009).

[2] Alqsous also fails to recognize that his conviction under 18 U.S.C. § 1961(d) mandates his base offense level be no less than Level 19 (U.S.S.G. § 2E1.1(a)) and that his conviction of an obstruction of justice offense likewise mandates a two-point enhancement. *See* U.S.S.G. § 3C1.1, cmt. 8.

nod" can suffice to demonstrate the existence of the agreement for the quid pro quo. *United States v. Blandford*, 33 F.3d 685, 698-99 (6th Cir. 1994), discussing *Evans v. United States*, 504 U.S. 255, 274 (1992) (Kennedy, J. controlling concurrence) ("The official and the payor need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods"); *see also United States v. Abbey*, 560 F.3d 513, 518 (6th Cir. 2009) ("Abbey is wrong in contending that, to sustain a Hobbs Act conviction, the benefits received must have some explicit, direct link with a promise to perform a particular, identifiable act when the illegal gift is given to the official. Instead, it is sufficient if the public official understood that he or she was expected to exercise some influence on the payor's behalf as opportunities arose") (citations omitted).

Alqsous further overlooks *Terry*'s explanation of what is truly needed in a Hobbs Act prosecution.  The Sixth Circuit explained:

> "[M]otives and consequences, not formalities," are the keys for determining whether a public official entered an agreement to accept a bribe, and the trier of fact is "quite capable of deciding the intent with which words were spoken or actions taken as well as the reasonable construction given to them by the official and the payor." *Evans* [] 504 U.S. [at] 274 [] (Kennedy, J., concurring in part and concurring in the judgment); […]*United States v. Wright,* 665 F.3d 560, 569 (3d Cir.2012) ("We rely on the good sense of jurors ... to distinguish intent from knowledge or recklessness where the direct evidence [of a quid pro quo] is necessarily scanty.").

707 F.3d at 613.  Contrary to Alqsous's assertion, the Supreme Court and the Sixth Circuit, as well as other courts of appeals, have routinely held that "nods and winks" are sufficient to find corrupt public officials guilty of Hobbs Act offenses, and that juries are more than capable of making this determination when the deals occur in the shadows and back alleys.  Here, the jury, seeing that the defendants **<u>explicitly</u>** expected to receive increased incentives, D1 bonuses and raises in return for providing Hills with a 75 inch television, apartments, briefcases and other things of value, properly found implicit and explicit agreements, nods and winks included.

4

**Alqsous's Arguments Regarding Harm to MetroHealth Do Not Withstand Scrutiny**

Alqsous twists and distorts certain trial testimony to his advantage while completely ignoring other testimony in an attempt to avoid the consequences of the harm he caused to MetroHealth. Specifically, he selectively quotes from the trial testimony of Amy Anderson and Dr. Alfred Connors to support the claim that no harm to patient access befell the hospital. In doing so, he fails to also acknowledge the following testimony from Ms. Anderson, Dr. Connors and Nicole Pistilli, among others:

Amy Anderson (R. 402, PageID 12676):

Q: If a dentist worked Monday through Friday, would they be able to see more patients than if they were only there three or four days a week?
A: Yes.

Dr. Connors (R. 403, PageID 13150):

Q: And would it have been okay for a full-time employee who was a 1.0 FTE to claim that they were working extra hours but not work five days a week?
A: I would have had a problem with that. No, I don't think that would have been okay.
Q: And why is that?
A: Because --
Q: Let me ask it this way. What would doing that do to patient access at the clinic?
A: Well, it would decrease … It would decrease patient access.

Nicole Pistilli (R. 400, PageID 12156):

Q: How did that affect your ability and the Department of Dentistry's ability to see patients at the hospital?
A: It put the workload on other dentists. They still had schedules, and you know, those patients had to be seen. So they were seen by other dentists.
Q: And what was your understanding of where these missing dentists were?
A: Just at another clinic.

Not only did Alqsous ignore this trial testimony, he also provided a declaration of Dr. Matthew Kirlough, dated March 14, 2019. Instead of providing unfiltered testimony at

5

sentencing or equivalent information from Dr. Kirlough in their sentencing memoranda, and in spite of being fully aware of the matters at issue in this case and relevant to sentencing, Defendant waited until after Dr. Brendan Patterson's transcript was made available to secure this affidavit. A review of Dr. Kirlough's declaration conveniently comports with cherry-picked portions of Dr. Patterson's testimony, and should be viewed in the manner in which it was received.

This late filing should also be considered in light of Dr. Kirlough's earlier statements made to Alqsous. On July 16, 2018, Alqsous provided the government with a transcription of an audio recording of Dr. Kirlough made on September 23, 2017, but ultimately decided not to present Dr. Kirlough as a witness. A copy of the interview transcript is attached hereto as Exhibit A. Of note, Dr. Kirlough's recently filed declaration is, at best, inconsistent with his earlier recorded conversations with Alqsous's private investigator Keith King. In particular, the following colloquy took place regarding the regularity and appropriateness of flex time:

| | |
|---|---|
| Keith King: | **Uh, did you ever think that**, uh, **Sari was ever working part-time**, back in, uh, '10, 2010 and 2013 while, uh, you were working at Metro. **And being paid full-time? That make any sense to you?** |
| Dr. Kirlough: | **No.** |
| Keith King: | Did you, uh, did you appr- |
| Dr. Kirlough: | There was a- there was a little rumor about it, I was suspicious. |
| Keith King: | Who was that? |
| Dr. Kirlough: | Bogden [Butree 00:50:51]. |
| Keith King: | Bogden who? |
| Dr. Kirlough: | Butree. |
| Keith King: | Butree? |

Dr. Kirlough: Yeah. He was a- he was an attending but he had his own office and sometimes I was aggravated because it seemed like every time I had a- my administration time, he might call in sick. So then I would have to go over and cover his clinic. So it was almost like I didn't want to put on the schedule that I was doing administrative stuff. (Laughs) Just- it was like, damn man fucking goddamit I gotta go over there and go to Lee Harvery and cover his ass.

Yeah, that was the only time, I was so aggravated I was- I wou- I- I almost, uh, went to his- I almost thought about going to his office just to see if he was practicing at the same time. Almost, I- I trusted him, he was a good kid, and I was just like- but it just-

Keith King: But you never did.

Dr. Kirlough: Never did. I- in my mind it was- it was- and it might've been my own mind, imagination fuckin' coming up with this stuff. But it just seemed that every time I put ADM, we had a- we had a, like a chart wherever we were supposed to be, we had multiple clinics, and so if you were in the OR and the attending in the OR you were in the OR, you could be at Patients Metro, you could be at Lee Harvery, you could be at Broadway. So it was all assigned and then the residents were assigned the same way, and, uh, you know we always wanted to have an attending with the residents cuz they were supposed to be underneath 'em and stuff like that. But every time that I had a chance, to like sit down and breathe and- and look at things other than running a clinic and tryna figure out can we fix resident shit.

Keith King: (Laughs)

Dr. Kirlough: (Laughs) Not everything that I was supposed to do, every time ADM was on the schedule it was like **somebody**, it was- it was like clockwork.

Keith King: Right.

Dr. Kirlough: **Somebody was gonna call and say oh it's gonna be** [inaudible 00:52:25]

Keith King: (Laughs)

Dr. Kirlough: I was so pissed. **They did it all the time, too**. And maybe it was just there's- I don't know, I just- maybe it was just my- I was so whacked out and so overworked, I was so looking forward to sitting down and- (laughs) and do what I was supposed to do, like ...

7

(Emphasis added). Dr. Kirlough's post-conviction declaration obtained after Dr. Patterson's testimony nevertheless claims that he "never once complained to anyone that I was working 5 days when others were working 4 days" and that "we always had adequate coverage from both the attending and residents on all days of coverage." *See* (R. 478-1: Decl. Dr. Kirlough, PageID 19817, 19820). Confusingly, Dr. Kirlough also claims that patients often had "to wait as long as 6 hours or more to see a dentist" but that the flex-time policy allowed for "adequate coverage" from the attendings. (*Id.* at PageID 19818).

Despite the above testimony and the recorded statement of his own potential witness, Alqsous argues that MetroHealth did not suffer any calculable loss as a result of his illicit receipt of full-time pay. This argument fails for multiple reasons. First, the evidence in fact shows that the hospital was consistently scrambling because of the flex-time schedule to obtain coverage for patients, creating a situation that did nothing to alleviate patient's 6-hour wait times (and betrays Defendant Alqsous's actual level of concern for the core mission of MetroHealth in providing much needed dental care to the indigent and poor of Cuyahoga County). Second, while it is true that MetroHealth and those dentists that actually showed up to work eventually treated the patients scheduled for a particular day, the *number* of patients scheduled was necessarily dependent on the number of attending dentists available on a given day. In this regard, MetroHealth would have to self-limit its capacity for potential patients due to the four-day scheduling for Alqsous, Al-Madani and ElRawy. Were the Dental Department to have a full complement of three full-time attending dentists (or dental-equivalent "LeBron James's") then it would stand to reason the hospital would have been able to schedule and accommodate additional patients for their fifth day of work. However, knowing that their services were not available, the dental department was forced to throttle its ability to maximize patient totals.

8

Having caused this very problem Alqsous now repugnantly blames his victim for not accounting for this lost revenue. Alqsous's claim that there were insufficient chairs at the hospital also directly conflicts with his convenient excuse that the chairs occupied by OHE clients were reserved for VIP clients. He cannot have it both ways.

Alqsous's further claims that the purpose of the "flex-time" decision was to prevent "burn-out"[3] are risible given that Alqsous and Al-Madani "avoided burn-out" not by actually taking a day off, but by operating their private dental practices. This is akin to an airplane pilot or truck driver ending their tour of duty on one plane or truck due to time limits, and then shortly thereafter proceeding to fly or drive another vehicle. Flying a plane or driving a truck for in excess of the allowed hours is still the same, whether it is in one or two vehicles. This principle should apply equally for dentists seeking to avoid "burn-out" – practicing dentistry is the same whether it is working at a public hospital or having that public hospital subsidize your private clinic.

### The Jury Has Determined Alqsous's Corrupt Intent

Alqsous attempts to use Dr. Kirlough as a proxy for his own mental state and have this Court reject the jury's finding of his corrupt intent. Not only is Dr. Kirlough incompetent provide insight as to Alqsous's mental state (*see* FRE 602, 701), the jury as "trier of fact is 'quite capable of deciding the intent with which words were spoken or actions taken as well as the

---

[3] Further in this regard, Dr. Kirlough's reference to the ACGME limits on attending dentists (R. 478-1, PageID 19820) is incorrect and a red herring. The ACGME is an association governing graduate medical education and its mandates are limited to the number of hours a **RESIDENT** or fellow may work continuously. There is no set standard affecting attending physicians or dentists. *See* https://www.acgme.org/Portals/0/PDFs/jgme-monograph%5B1%5D.pdf at Chap. 5 (Last Accessed March 29, 2019). Moreover, to the extent that these time limits would be applicable, they should also extend to the level of care that the defendants provided in their private clinics as well.

9

reasonable construction given to them by the official and the payor.'" *Terry*, 707 F.3d at 613, quoting *Evans,* 504 U.S. at 274 and *Wright*, 665 F.3d at 569.  Accordingly, Alqsous's belated post-conviction attempts to demonstrate his lack of illegal intent and knowledge should be disregarded by this Court.  Nor do these (11 years) later self-serving statements avoid the fact that he consciously lied to MetroHealth about his Boston arrest and failed to disclose his solicitation and receipt of bribes from resident applicants.  Indeed, in the proper context, Dr. Kirlough's own perception and understanding of the MetroHealth Dental Department are vastly different from Alqsous's.  Dr. Kirlough himself did not participate in the Hobbs Act conspiracy, and thus had no knowledge of any corrupt dealings between Alqsous and Hills.  *See* Exhibit A, p. 5 (referencing the allegations in the Indictment: "I mean, my wife kinda gave me updates on it, but I was just ... not- not, I guess I would- people always ask me, were you shocked? I wasn't shocked, no. Disappointed? Yeah […] disappointed kinda in the sense that I- I was, that ***I was blind to a lot of the shit***. You know, I- I mean I was ... disappointed that all that could go on.").  He also simply repeats that Alqsous Exhibit 17 "reflects" certain information.  This is not helpful.  He did not create that compilation nor is he aware of what statistics were used to produce it.  Kelly Andolek did and she explained why Exhibit 17 was incomplete and thus misleading.  (R. 408, PageID 14414, et. seq.) (referencing GX 4109-4113).  The trial testimony by individuals knowledgeable about the exhibit speaks for itself.  Dr. Kirlough's mere recitation of documents is superfluous and uninformative, as shown by his complete lack of knowledge of the difference between Dental and Medical billing, and should be disregarded by this Court.

### Alqsous Ignores MetroHealth's Costs in Responding to His Malfeasance

The government again refers the parties to MetroHealth's losses sustained in responding to the federal investigation into Alqsous's and his co-defendants' bad conduct.  *See* (R. 460-4:

Summary of Expenses, PageID 18888).  While Alqsous ignores this information, the document clearly demonstrates the expenses MetroHealth expended beginning in July 2014, when the federal investigation began.  Accordingly, the hospital is entitled to restitution for having to contend with and respond to the investigation into his criminal behavior.

### **Alqsous's Potential Prison Placement Is Not an Appropriate Sentencing Consideration**

Alqsous's claims that he will be treated worse than co-defendant Hills are at this point highly speculative.  He is not currently subject to a final order of removal.  He has not been placed in the custody and confinement of the Bureau of Prisons, and their determination of where to place him has not yet been made.  Indeed, pursuant to the First Step Act, the BOP is required to perform a complete assessment on him and his co-defendants.  Accordingly, this Court has no comparison to make with the treatment and placement co-defendants may receive from the BOP.  Congress has given the BOP vast discretion by statute to determine the appropriate conditions under which a prisoner shall serve his or her sentence.  18 U.S.C. § 3621(b). However, this is no guarantee that the BOP will place any of the defendants in either a "nice" prison or a "less nice" prison.  The statute simply empowers the BOP to place convicted felons as it sees fits.

Likewise, legitimate policy interests and Congress's plenary power over alien affairs. *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 n. 21 (1976); *see also Plyler v. Doe,* 457 U.S. 202, 219 n. 19 (1982) ("With respect to the actions of the Federal Government, alienage classifications may be intimately related to the conduct of foreign policy...."); *Harisiades v. Shaughnessy,* 342 U.S. 580, 588-89 (1952) ("It is pertinent to observe that any policy towards aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations.... Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference."), and thus provide

11

sufficient reason to uphold potentially differential treatment in the enactment of the First Step Act.  Moreover, the First Step Act was passed in contemplation of returning a prisoner to society at the earliest possible time.  The same cannot be said for a potentially deportable alien, who instead has every incentive to escape and flee, and it should be presumed that Congress duly contemplated and deliberately excluded deportable aliens from early release programs.

To the extent that Alqsous may serve additional time in ICE detention following incarceration, such is a product of his own doing.  The times and waits he suggests are those expected for individuals contesting their deportation, not those agreeing to expedited removal.  Accordingly, this Court should give little if any consideration to Alqsous's potential immigration ramifications, especially when he himself failed to do so during his eight-year corruption spree at MetroHealth, as a reason to reduce his sentence and his status should not somehow grant him a windfall over his co-defendants.

## Conclusion

While people can differentiate between facts and opinions this salient truth remains – in the criminal justice system one can have their opinion, but not their own facts.  The jury has spoken in this matter and the evidence supports their conclusions and findings of facts.  It *is* unfortunate that Alqsous did not use his talents, skill, education and upbringing for legitimate purposes.  Instead, over eight long years during which he had numerous opportunities to reflect on his conduct, he used them only for his own benefit and to the expense and detriment of the public and in a community already rocked by years of public corruption.  These are the facts of *this* case, in which Alqsous stands convicted of serious public corruption charges.  Cuyahoga County and the Northern District of Ohio are the heartland in which he continued to perpetrate public corruption offenses despite a very-well publicized scandal.  When the context of his crimes, including the heartland and backdrop in which they were committed, and his history and character are considered, it is clear that a significant period of incarceration is appropriate.

        Respectfully submitted,

        JUSTIN E. HERDMAN
        United States Attorney

By:    /s/ *Om M. Kakani*
        AUSA Om M. Kakani (NY 4337705)
        Assistant U.S. Attorney
        United States Court House
        801 West Superior Avenue, Suite 400
        Cleveland, Ohio 44113-1852
        (216) 622-3756
        Om.Kakani@usdoj.gov

## CERTIFICATE OF SERVICE

    I hereby certify that on this 31st day of March 2019 a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's system.

                /s/ *Om M. Kakani*
                Om M. Kakani
                Assistant U.S. Attorney