# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:16-cr-329-2 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | CHIEF JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| SARI ALQSOUS, | ) | |
| | ) | |
| | ) | |
| DEFENDANT. | ) | |

On October 11, 2023, defendant Sari Alqsous ("Alqsous") filed, through counsel, a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. (Doc. No. 681 (§ 2255 Motion); *see* Doc. No. 693 (Memorandum in Support).) On September 20, 2024, Alqsous filed a counseled amended motion to vacate. (Doc. No. 740 (Amended § 2255 Motion).) The motions are fully briefed. (*See* Doc. No. 708 (Response to § 2255 Motion); Doc. No. 730 (Reply to § 2255 Motion); Doc. No. 747 (Response to Amended § 2255 Motion); Doc. No. 754 (Reply to Amended § 2255 Motion).) For the reasons that follow, each motion is denied in full.[1]

## I.      BACKGROUND

The facts of the RICO conspiracy at issue in this case have been set forth in detail in numerous opinions by this Court and the Sixth Circuit. *See, e.g.*, *United States v. Hills*, 27 F.4th

---

[1] For the sake of clarity, the two § 2255 motions are discussed and ruled upon separately. The second motion to vacate (Doc. No. 740), however, is considered a motion to amend the original motion (Doc. No. 681) and does not constitute a second or successive petition. *See Clark v. United States*, 764 F.3d 653, 658 (6th Cir. 2014) ("A motion to amend is not a second or successive § 2255 motion when it is filed before the adjudication of the initial § 2255 motion[.]")

1155 (6th Cir. 2022); *United States v. Hills*, No. 1:16-cr-329, 2023 WL 1108042 (N.D. Ohio Jan. 30, 2023). Familiarity with these prior decisions is assumed. The Court will only set forth enough facts to frame the issues raised in Alqsous's motions.

On July 27, 2018, after a five-week trial, a jury returned multiple guilty verdicts against Alqsous and his co-defendants relating to a criminal conspiracy involving their employment as dentists at MetroHealth Hospital ("MetroHealth"), a public hospital receiving federal and state funding. (Doc. No. 338 (Sari Alqsous Verdicts); *see* Doc. No. 337 (Edward Hills Verdicts); (Doc. No. 339 (Yazan Al-Madani Verdicts); Doc. No. 340 (Tariq Sayegh Verdicts).) The crimes for which Alqsous was found guilty included: RICO conspiracy; conspiracy to commit extortion under color of right (Hobbs Act conspiracy); conspiracy to commit bribery concerning programs receiving federal funds; conspiracy to commit honest services mail and/or wire fraud; bribery concerning programs receiving federal funds; conspiracy to commit money and property mail and/or wire fraud; conspiracy to solicit, receive, offer and pay health care kickbacks; offering or paying kickbacks in connection with a federal health care program; and conspiracy to obstruct justice and tamper with witnesses. (Doc. No. 338.)

At all times relevant to the Indictment, defendant Edward Hills ("Hills") served in positions of authority for MetroHealth, first as Chair of the Dental Department and eventually as Chief Operating Officer. Alqsous, defendant Yazan Al-Madani ("Al-Madani"), and defendant Tariq Sayegh ("Sayegh") were dentists who worked in the Dental Department under Hills. At trial, the government presented testimony from more than 50 witnesses, as well as evidence that included wire transfers, financial and employment records, emails, text messages, photographs, and wiretaps demonstrating that Alqsous and his co-defendants engaged in a pattern of corrupt and

fraudulent activity through six separate fraudulent schemes. Given the complexity of the case, the government's presentation of evidence was organized by scheme, and the government advised the jury when it switched from one scheme to another. (*See, e.g.*, Doc. No. 404 (Trial Transcript), at 304.[2])

Of the six schemes forming the core of the government's case, the "stream of benefits" scheme features most prominently in Alqsous's motions. Under this scheme, Hills solicited and received from Alqsous, Al-Madani, and a third dentist, Hussein Elrawy ("Elrawy"), cash and other things of value in exchange for unearned employment-related benefits. In finding that sufficient evidence was offered at trial to support the "stream of benefits" scheme, the Sixth Circuit observed:

> **Bribery.** Ample evidence from multiple witnesses, corroborated by documents and text messages, established that Hills solicited and received from Alqsous, Al-Madani, and Elrawy tens of thousands of dollars in cash, many five-star dinners, use of an apartment and purchase of a computer for his girlfriend, airline tickets, hotel stays, prescription drugs, car repairs, an expensive television, and a $3,600 Louis Vuitton briefcase. Defendants argued that those things were simply gifts, but the jury had more than an adequate basis to reject that claim.
>
> Indeed, unindicted coconspirator Dr. Hussein Elrawy specifically testified that he, Alqsous, and Al-Madani provided the things of value to Hills in return for promises of favorable employment-related actions. Elrawy explained that Hills took or promised to take favorable action, including: (1) making adjustments to the department's incentive bonuses, which Hills tracked on spreadsheets and discussed over expensive dinners; (2) assigning them high value procedures such as the first in a series of visits by a denture patient (DI); (3) adopting and maintaining a "flex" scheduling policy under which they received full time pay for fewer than five days of work per week that allowed them to work at their outside clinics; and (4) creating an additional dental resident position for Lufti Nassar—Alqsous's preferred candidate—when it appeared that Nassar would not be selected for the residency program.

*See Hills*, 27 F.4th at 1175–76 (footnote omitted).

---

[2] All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic filing system.

The jury also heard considerable testimony regarding the "obstruction of justice" scheme involving Hills, Alqsous, and Al-Madani. "Evidence of that conspiracy included recorded discussions during a dinner meeting, a warning to one of the bribing residents to stay quiet, preparing a Form 1099 to hide the 'kickback' payment to Hills, and telling a grand jury witness to 'forget about' seeing envelopes of cash." *Id*. at 1171. A third scheme discussed in the present motions is the Oral Health Enrichment ("OHE") scheme wherein Hills, Alqsous, and Al-Madani used MetroHealth resources to run Hills's private company that provided remediation services to dentists "who needed to cure disciplinary or performance issues." *Id*. at 1183. The "dental resident bribery" scheme also has some relevance herein. In this scheme, Alqsous, Al-Madani, and Sayegh (all foreign-trained dentists) accepted bribes from other foreign-trained dentists seeking admission to MetroHealth's dental residency program. *Id*. at 1170. Alqsous, Al-Madani, and Sayegh exploited their connections with foreign-trained dentists and their relationship with Hills in order to obtain admission for dentists who paid them bribes.

Prior to the Court charging the jury, counsel for the parties and the Court engaged in robust dialogue over the substance of the jury instructions. (*See* Doc. No. 412 (Trial Transcript), at 3 (Court noting that, after the formal charging conference on Friday afternoon (July 28, 2018), counsel and the Court worked through the weekend to resolve the objections and finalize the instructions before formally placing the objections on the record); *see also id*. at 4–35 (summary of objections).)  Before the jury retired to deliberate, the Court read for the jury the 95 printed pages of instructions. (Doc. No. 412, at 37–79, 80–119, 120–161, 162–177, 182–83; Doc. No. 414 (Trial Transcript), at 45–54.) The jury was also supplied a copy of the instructions and verdict forms to use during their deliberations.

4

The printed instructions were separated by count and, for each count, the instructions provided an excerpt from the relevant portion of the Indictment—including the factual basis for each count set forth in the Indictment—as well as the elements for that particular offense. To assist the jurors, the printed instructions included several charts organized in different ways. One chart was organized by defendant, showing the particular charges against each defendant. Another chart was organized by count, and included the relevant statutory provision, the defendants charged, the corresponding pages in the Indictment and instructions, and the scheme involved for each count. (*See id.* at 51–52 (discussion of the charts).)

The jury verdict forms were also separated by defendant and count. The verdict forms for the substantive counts also included additional information relating to the subject of the count. For example, the verdict form for Count 5, charging Alqsous with bribery concerning programs receiving federal funds, stated that it involved bribery concerning "Seim and Issa Salameh," individuals who were involved in the bribery associated with Seim's application to MetroHealth's dental residency program. (Doc. No. 338, at 5.)

After the Court received the jury's verdicts and ordered the preparation of Presentence Investigation Reports, Alqsous and his co-defendants renewed their motions for judgment of acquittal, which the Court denied in a memorandum opinion issued on December 21, 2018. (Doc. No. 421 (Memorandum Opinion).) Alqsous also filed a sentencing memorandum and supplements (Doc. Nos. 447, 455, 478), in addition to a memorandum in response to the Court's amended Sentencing Guidelines determination. (*See* Doc. No. 491.) Following a multi-day hearing with all defendants on shared issues relating to sentencing (*see* Minutes of Proceedings [non-document], 2/11/2019; Minutes of Proceedings [non-document], 2/12/2019), the Court sentenced Alqsous to

an aggregate custody term of 151 months. (Doc. No. 517 (Alqsous Judgment), at 2; *see* Minutes of Proceedings [non-document], 5/24/2019.) The Court also ordered Alqsous to pay restitution in the amount of $913,841.88 and a special assessment in the amount of $1,600.00. (Doc. No. 517, at 6.)

Alqsous took a direct appeal from the Court's judgment. (Doc. No. 494 (Notice of Appeal); Doc. No. 514 (Notice of Appeal); Doc. No. 531 (Amended Notice of Appeal).) The Sixth Circuit consolidated Alqsous's direct appeal with the appeals taken by his co-defendants, and, on March 3, 2022, the Sixth Circuit entered a decision affirming this Court's judgments. (Doc. No. 627 (Opinion); *see* Doc. No. 580 (Consolidation Order)); *Hills*, 27 F.4th at 1203. Alqsous sought and was denied certiorari by the United States Supreme Court. (Doc. Nos. 655 and 657, respectively.) He also filed various post-judgment motions with this Court, including a renewed motion for judgment of acquittal and for a new trial, a motion for bond pending appeal, and a motion for compassionate release. (Doc. Nos. 532, 583, 608, 622.) Each motion was denied. (*See* Doc. Nos. 567, 579, 589, 624, 637, 666; Order [non-document], 7/01/2021.)

The present motion to vacate and amended motion to vacate followed. At the parties' request, the Court reluctantly permitted numerous extensions of the briefing schedule for each motion. (Order [non-document], 11/07/2023; Order [non-document], 12/11/2023; Order [non-document], 12/27/2023; Order [non-document], 3/19/2024; Order [non-document], 4/24/2024; Order [non-document], 5/16/2024; Order [non-document], 6/17/2024; Order [non-document], 7/2/2024; Order [non-document], 9/5/2024; Order [non-document], 9/16/2024; Order [non-document], 10/17/2024; Order [non-document], 11/12/2024; Order [non-document], 12/11/2024; *see* Doc. Nos. 682, 688, 692, 703, 710, 715, 719, 723, 738–39, 745, 749, 753.) With briefing finally

complete, the Court now issues its decision.

## II.        STANDARD OF REVIEW

A federal prisoner may attack the validity of his sentence by filing a motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255 in the district court where he was sentenced. Section 2255 sets forth four grounds upon which a federal prisoner may state a claim for relief: "[1] the sentence was imposed in violation of the Constitution or laws of the United States, or [2] that the court was without jurisdiction to impose such sentence, or [3] that the sentence was in excess of the maximum authorized by law, or [4] [the sentence] is otherwise subject to collateral attack[.]" 28 U.S.C. § 2255(a).

To prevail under § 2255, "a petitioner must demonstrate the existence of an error of constitutional magnitude which had a substantial and injurious effect or influence on the guilty plea or the jury's verdict." *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)). "Relief is warranted only where a petitioner has shown 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *Id.* (quoting *Davis v. United States*, 417 U.S. 333, 346, 94 S. Ct. 2298, 41 L. Ed. 2d 109 (1974)).

The movant bears the burden of articulating sufficient facts to state a viable claim for relief under § 2255. *McQueen v. United States*, 58 F. App'x 73, 76 (6th Cir. 2003) (per curiam). Vague and conclusory claims that are not substantiated by allegations of specific facts with some probability of verity are not enough to warrant relief. A § 2255 motion may be dismissed if it only makes conclusory statements without substantiating allegations of specific facts and fails to state a claim cognizable under § 2255. *O'Malley v. United States*, 285 F.2d 733, 735 (6th Cir. 1961);

7

*see Green v. Wingo*, 454 F.2d 52, 53 (6th Cir. 1972).

When a factual dispute arises in a § 2255 proceeding, an evidentiary hearing is required "'to determine the truth of the petitioner's claims.'" *Valentine v. United States*, 488 F.3d 325, 333 (6th Cir. 2007) (quoting *Turner v. United States*, 183 F.3d 474, 477 (6th Cir. 1999)). The burden borne by a § 2255 petitioner to obtain a hearing is not onerous. *See Smith v. United States*, 348 F.3d 545, 551 (6th Cir. 2003) (citing *Turner,* 183 F.3d at 477). But a petitioner is not entitled to an evidentiary hearing if he has not alleged any facts that, if true, would entitle him to federal habeas relief. *See McSwain v. Davis*, 287 F. App'x 450, 458 (6th Cir. 2008); *Amr v. United States*, 280 F. App'x 480, 485 (6th Cir. 2008) (holding that an evidentiary hearing was "unnecessary" where there was "nothing in the record to indicate that [the petitioner] would be able to prove his allegations" at a hearing); *see also Napier v. United States*, No. 93-5412, 1993 WL 406795, at *2 (6th Cir. Oct. 8, 1993) ("To be entitled to a hearing, the prisoner must set forth detailed factual allegations which, if true, would entitle him to relief under § 2255." (citing, among authorities, *Machibroda v. United States*, 368 U.S. 487, 496, 82 S. Ct. 510, 7 L. Ed. 2d 473 (1962))); *see also Valentine*, 488 F.3d at 334 (finding that the burden is met where the petitioner "offers more than a mere assertion of his innocence; he presents a factual narrative of the events that is neither contradicted by the record nor 'inherently incredible.'").

Moreover, a hearing is not necessary when a petitioner's claims "'cannot be accepted as true because they are contradicted by the record, inherently incredible, or [are] conclusions rather than statements of fact.'" *Id*. (quoting *Arrendondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999)). Where, as here, the judge considering the § 2255 motion also presided over the trial, the judge may rely on her recollections of the trial. *Blanton v. United States*, 94 F.3d 227, 235 (6th

8

Cir. 1996) (citing *Blackledge v. Allison*, 431 U.S. 63, 74 n.4, 97 S. Ct. 1621, 52 L. Ed. 2d 136 (1977)).

The Court finds that an evidentiary hearing is not warranted in the present case. As set forth in detail below, Alqsous has failed to identify facts that, if true, would entitle him to relief under § 2255. Moreover, many arguments offered by Alqsous in support of the present motions are either contradicted by the record, time-barred, procedurally defaulted, or are presented in a perfunctory and conclusory manner, preventing further review by this Court.

## III.     ALQSOUS'S MOTION TO VACATE

Alqsous's motion to vacate raised four claims of ineffective assistance of counsel. Ground One alleged that trial counsel failed to conduct a meaningful pre-trial investigation, especially as it related to the interviewing of potential witnesses. (Doc. No. 681, at 4.) Ground Two alleged that trial counsel failed to properly advise Alqsous during pre-trial plea negotiations. (*Id.* at 5.) In Ground Three, Alqsous claimed trial counsel was ineffective for failing to retain an expert on "dentistry billing practices and procedures." (*Id.* at 7.) In his memorandum in support, Alqsous amended Ground Three to also allege that counsel was ineffective for failing to retain an expert on flexible schedules in the medical profession. (Doc. No. 693, at 10–11.) In Ground Four, Alqsous alleged that trial counsel was ineffective for failing to move for a severance. (Doc. No. 681, at 8.)

### A.  Ineffective Assistance of Counsel Standard

The constitutional anchor for each ground raised in the motion to vacate (Grounds One through Four) is the Sixth Amendment's right to effective assistance of counsel. "To prevail on an ineffective-assistance-of-counsel claim, [a petitioner] must satisfy the two-pronged test announced in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)." *Wingate v.*

*United States*, 969 F.3d 251, 255 (6th Cir. 2020). Specifically, the petitioner must demonstrate: (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant, resulting in an unreliable or fundamentally unfair outcome. *Strickland*, 466 U.S. at 687–88; *see also Williams v. Taylor*, 529 U.S. 362, 390–91, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). The Court may address the *Strickland* prongs in any order and need not address both prongs if the petitioner "makes an insufficient showing on one." *See Wingate*, 969 F.3d at 955 (quotation marks and citation omitted).

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010). "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id*. Counsel's performance must be evaluated from the perspective existing at the time of the representation, not from the perspective of hindsight. *Id*. Indeed, a prisoner must show that counsel made errors so serious that he was not functioning as the counsel guaranteed by the Sixth Amendment, and that counsel's errors were so serious as to deprive him of a fair trial. *Strickland*, 466 U.S. at 687–88; *United States v. Hanley*, 906 F.2d 1116, 1120–21 (6th Cir. 1990); *Flippins v. United States*, 808 F.2d 16, 18 (6th Cir. 1987); *see also United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) ("Counsel is constitutionally ineffective only if performance below professional standards caused the defendant to lose what he otherwise would probably have won." (citing *Strickland, supra*)).

A criminal defendant has the right to effective assistance of counsel at "all 'critical stages of the criminal proceedings.'" *Missouri v. Frye*, 566 U.S. 134, 140, 132 S. Ct. 1399, 182 L. Ed. 2d

379 (2012) (quoting *Montejo v. Louisiana*, 556 U.S. 778, 786, 129 S. Ct. 2079, 173 L. Ed. 2d 955 (2009) (further citations omitted)). Included within the definition of a "critical stage" are pretrial investigations and plea negotiations. *See Byrd v. Skipper*, 940 F.3d 248, 255 (6th Cir. 2019) ("But the Sixth Amendment's requirement that defendants receive the effective assistance of competent counsel extends to all critical stages of a criminal proceeding, including pretrial plea negotiations." (quotation marks and citations omitted)); *Mitchell v. Mason*, 325 F.3d 732, 743 (6th Cir. 2003) (holding that the pre-trial period devoted to investigation and trial preparation is a "critical stage" that entitles a criminal defendant to the effective assistance of counsel (citations omitted)).

### B. Effectiveness During Pretrial Investigation (Ground One)

Counsel has a duty under the Sixth Amendment to conduct reasonable investigations or to make a reasonable decision that investigations are unnecessary. *See Sims v. Livesay*, 970 F.2d 1575, 1580–81 (6th Cir. 1992) (citing *Strickland*, 466 U.S. at 691). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; [but] strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91; *see also Carson v. United States*, 3 F. App'x 321, 324 (6th Cir. 2001) ("While the temptation to rely on hindsight is particularly strong in the context of ineffective assistance claims based on counsel's failure to investigate, the court must conclude that counsel's strategic choices made after less than complete investigation are not constitutionally deficient if reasonable professional judgment supports the limitations on investigation." (citing *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998))).

In Ground One, Alqsous alleges that counsel was constitutionally ineffective by "fail[ing]

11

to investigate and interview key fact witnesses[.]" (Doc. No. 681, at 4.) According to Alqsous, counsel failed to "interview the resident dentists or conduct any meaningful investigation prior to indictment despite being provided with names of possible witnesses." (Doc. No. 693, at 4.) He lists a number of individuals who, he believes, "would have buttressed Dr. Alqsous' defense that he in fact worked more than 40 hours per week consistent with the employment policies of MetroHealth in place at that time thereby undermining the government's fraud charges . . . and otherwise demonstrating that MetroHealth suffered no loss." (Doc. No. 693, at 4; *see* Doc. No. 681, at 4 (listing names).)

To the extent Alqsous challenges the effectiveness of his counsel's investigations "prior to indictment[,]" his claim does not implicate a constitutional right and is denied for this reason alone. "Guided by the 'plain language' of the Sixth Amendment and its purpose of protecting individuals in adversarial proceedings, the Supreme Court has held that the right to counsel 'does not attach until the initiation of adversary judicial proceedings.'" *Kennedy v. United States*, 756 F.3d 492, 493 (6th Cir. 2014) (quoting *United States v. Gouveia*, 467 U.S. 180, 187–90, 104 S. Ct. 2292, 81 L. Ed. 2d 146 (1984) (further citations omitted))). Counsel cannot have been constitutionally ineffective for conduct taking place before the government initiated criminal proceedings against Alqsous. *See id.* (affirming the district court's denial of defendant's motion to vacate alleging ineffective assistance of counsel during pre-indictment plea negotiations); *see also Turner v. United States*, 885 F.3d 949, 955 (6th Cir. 2018) (holding that when there is no Sixth Amendment right to counsel there is accordingly no basis for a claim of ineffective assistance of counsel (citations omitted)).

Upon indictment, the Court finds that Alqsous's trial counsel conducted a constitutionally

adequate investigation. "There is no bright-line rule for determining whether a given investigation was adequate." *Smith v. United States*, 617 F. Supp. 3d 828, 837 (M.D. Tenn. 2022) (citing *Strickland*, 466 U.S. at 688–89). "However, finding that an attorney interviewed his client, interviewed other witnesses, reviewed discovery, and pursued evidence to support a defense theory generally will support a finding that an attorney adequately investigated his client's case." *Id.* (citing *Jackson v. Warden*, 622 F. App'x 457, 461 (6th Cir. 2015)).

Discovery in this case was voluminous. The government's pretrial Fed. R. Crim. P. 16 disclosures in this complex fraud case were substantial, with each defendant receiving a four-terabyte hard drive containing discoverable material. (Doc. No. 243 (Ruling on Discovery Motions), at 2.) Alqsous does not suggest that his counsel failed to review the produced materials or discuss the discovery with him, and, in fact, the Court granted several defense motions to continue the trial dates to allow sufficient time for pretrial investigation and review. (*See, e.g.*, Doc. Nos. 68, 163 (Orders to Continue).) Counsel also filed a discovery demand (Doc. No. 44), discovery-related motions (Doc. Nos. 137, 138), a motion to suppress evidence (Doc. No. 207), and motions in limine. (Doc. Nos. 252–54.) If anything, the record shows that counsel's pretrial review of and pursuit of discovery was thorough.

Nevertheless, Alqsous claims that trial counsel's failure to interview and call certain witnesses, who he now believes would have supported his defense —including providing evidence that Alqsous worked more than 40 hours in a week, despite working a flexible schedule where he worked four days a week at MetroHealth and a fifth weekday at his private clinic—was ineffective. His argument fails for several reasons. To start, Alqsous has not produced any evidence, such as an affidavit, declaration, or interview report, to support what he claims these potential witnesses

13

might have said.  Nor has he indicated whether these witnesses would have been willing to speak with counsel before trial or testify at trial. Instead, he merely offers his guess as to what each potential witness might have testified to if called at trial. (*See* Doc. No. 693, at 4–8.) This falls short of establishing ineffectiveness. *See Tinsley v. Million*, 399 F.3d 796, 810 (6th Cir. 2005) (affirming denial of an ineffective assistance claim based on counsel's failure to call witnesses where a petitioner did not "introduce[] affidavits or any other evidence establishing what they would have said"); *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) ("[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on an affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." (citations omitted)); *see also Talley v. United States*,  Nos. 1:00-cv-74, 1:94-cr-118, 2006 WL 3422997, at *9, 10 (E.D. Tenn. Nov. 27, 2006) ("To present a viable ineffective assistance of counsel claim based on an alleged failure by counsel to call a witness to testify at trial, [the petitioner] must make an affirmative showing as to the identity and availability of the witness to testify, the details of what the uncalled witness would have testified to, and that the testimony of the uncalled witness would have produced a different, more favorable result. . . . The court will not grant any § 2255 relief to [the petitioner] or hold an evidentiary hearing based on the purported testimony of an uncalled witness where [the petitioner] has not bothered to submit supporting affidavits from them." (citations omitted)).

But even if he had properly substantiated his motion with affidavits or declarations from his proposed witnesses, the testimony Alqsous claims these witnesses were likely to offer if called would not have changed the outcome at trial. The main thrust of his argument is that trial counsel

14

failed to call individuals who would have testified that Alqsous worked more than 40 hours in a given workweek. For example, he claims that Robin Wyatt, a dental hygienist at MetroHealth, would have testified that Alqsous was often already at the hospital when she arrived in the morning and stayed long after she left for the day. (Doc. No. 693, at 4–5.) Similarly, he claims that his fiancée, Jennifer DiPiero, would have testified that Alqsous was a "top producer" and that 60–70-hour workweeks at MetroHealth were "common[.]" (*Id*. at 7.)

Factually, such testimony would not have established that Alqsous satisfied MetroHealth's definition of full-time employment. Rather, Dr. Alfred Connors, MetroHealth's Chief Medical Officer, testified that "physicians [including dentists] are . . . salaried employees. Not hourly employ[ee]s." (Doc. No. 403 (Trial Transcript), at 303–10; *see also* Doc. No. 404, at 34–36 (Dr. Connors explaining that a dentist could not work at an outside clinic without permission from MetroHealth and a full vetting).) "[T]hey don't work a 40-hour week. And we expect them—the average physician actually works 55 to 60 hours a week." (Doc. No. 403 (Trial Transcript), at 303.) He stated that "we expect [physicians] to be there *five days a week* if they're full time." (*Id*. at 304–05 (emphasis added).) "So we don't let people say I worked a certain number of hours and once you reach 40 you can stop." (*Id*. at 303–04.)

Dr. Connors explained that, if a physician wanted to work fewer than five days per week, they could not "just jump onto a flextime program[.]" Rather, any such arrangement "would have to be approved by their chair and ultimately signed off by [him (Dr. Connors)]." (*Id*. at 305–06.) For example, the jury heard testimony that Dr. Al-Shami was permitted to work a flexible schedule—four days at MetroHealth and a fifth day at his private clinic. (Doc. No. 402 (Trial Transcript), at 41–98.) Dr. Al-Shami testified that his employment at MetroHealth included seeing

patients at the Cuyahoga County Jail. Because his work at the county jail did not generate as much income as dentists working at the hospital—resulting in a lower bonus from MetroHealth—Dr. Al-Shami sought and received permission to work one day a week at his private clinic to supplement his income. (*Id*. at 85–86.) Counsel for Alqsous and his co-defendants thoroughly cross-examined Dr. Al-Shami on his arrangement with MetroHealth, emphasizing that he (like the defendants) worked at MetroHealth fewer than five days a week but put in 40 or more hours each week. (*Id*. at 84.)

And legally, the proposed witnesses' testimony would not have aided Alqsous's defense. Alqsous was not convicted of working a flexible schedule or working fewer than 40 hours in a week. Rather, the "stream of benefits" scheme was unlawful because a flexible schedule was one of the many unearned employment-related benefits Alqsous and his co-conspirators received from Hills in exchange for cash and other things of value. Dr. Connors was clear that he never approved Hills's flex time policy that allowed dentists of Hills's choosing (i.e., those who had paid him a bribe) to work fewer than five days a week simply so that they could work in their private clinics. (Doc. No. 403, at 303–08, Doc. No. 404, at 35–36.) The fact that Alqsous may have worked more than forty hours in a workweek would not have supported the argument that his flexible schedule, or any other charged employment benefit from Hills, was not the result of bribery.

Similarly, testimony that Alqsous was a good dentist, whose professional efforts may have benefitted MetroHealth, would not have dispelled the notion that Alqsous engaged in bribery. It also would have been cumulative of testimony offered at trial, as the jury heard testimony and saw documentation that Alqsous was one of the most productive members of the MetroHealth staff, generating the highest revenue for the hospital during the time period relevant to the charged

16

conspiracies. (*See, e.g.*, Doc. No. 403, at 299–300; Doc. No. 404, at 186–87, 189.) Counsel cannot be considered ineffective for failing to call witnesses who would have offered testimony that would have either been irrelevant or merely cumulative. *See Millender v. Adams*, 376 F.3d 520, 527 (6th Cir. 2004) ("A defense counsel has no obligation to call or even interview a witness whose testimony would not have exculpated the defendant." (quotation marks and citations omitted)); *United States v. Pierce*, 62 F.3d 818, 833 (6th Cir. 1995) (holding that failure to supply cumulative evidence is not ineffective assistance of counsel).

Alqsous also claims that potential witnesses, such as Wyatt and Caroline Hong (a pediatric dentist at MetroHealth) and others, could have attested to the work environment at MetroHealth under Hills as stressful, with no breaks and long days as the norm for all dentists and residents. (*See generally* Doc. No. 693, at 4–8.) Such testimony also would not have advanced Alqsous's defense. And, in any event, it would have been cumulative of testimony from other witnesses, including Elrawy. (Doc. No. 405 (Trial Transcript), at 23 (explaining that the work environment at MetroHealth under Hills was "[v]ery stressful, very hectic, very hostile environment"); *see, e.g.*, Doc. No. 400 (Trial Transcript), at 186 (Thandeka Cox describing the "workplace atmosphere" as "stressful").)

And some of Alqsous's proposed testimony would have likely damaged the defense. For example, Alqsosus suggests that had counsel interviewed Angela Marie Kane ("Kane"), a MetroHealth employee, he would have discovered that she would have testified that "[t]here was no money paid toward her house as alleged in the Indictment[.]" (Doc. No. 693, at 7.) Kane had a romantic relationship with Hills. Elrawy, an unindicted co-conspirator, testified that, around 2012, Hills directed Alqsous, Al-Madani, and himself to give Kane money as a down payment for her

house. (Doc. No. 405 (Trial Transcript), at 51–52.) The government corroborated this testimony with evidence of a $5,000 cash deposit into Hill's bank account on August 2, 2012, and a receipt for a $5,000 bank check payable to "Pulte Homes" by Kane, also dated August 2, 2012. (Doc. No. 409 (Trial Transcript), at 175–76.) Alqsous fails to explain how Kane would have handled the government's cross-examination with the financial records corroborating the existence of the bribe, or how she would have handled questions about testimony from various witnesses regarding Kane's alleged extensive involvement in assisting Hills coordinate the OHE scheme (*see* Doc. No. 708, at 14 (collecting record cites)); that is, if she would have been willing to testify at all, given her own potential criminal exposure. Counsel cannot have been considered ineffective for failing to call a witness implicated in the charged conspiracies.

Similar landmines would have surrounded the testimony of his fiancée, DiPiero. At trial, the government introduced a series of text messages exchanged between Alqsous and DiPiero, in which the two appear to discuss the things of value Alqsous gave Hills in exchange for employment related benefits. In one such exchange, Alqsous appears to brag to DiPiero about an arrangement wherein Hills gave Alqsous an increased bonus in exchange for Alqsous permitting Hills to use an apartment for his romantic rendezvous. Alqsous texted DiPiero stating, "I made a deal with [H]ills loool . . . He is paying me 1000 dollar every month for that room hahahah . . . .Let the taxpayers pay for it." DiPiero responded "Oh, no" and "Sucker." (Doc. No. 404, at 71–72, 85–86, and Gov't Ex. 4300-S.) Alqsous suggests that DiPiero "could have explained the context" for the text, but he fails to explain what that context would have been or how it would have advanced his defense. (Doc. No. 693, at 7.) While DiPiero appeared on Alqsous's counsel's witness list, counsel wisely elected not to call a witness who would have been extremely vulnerable to vigorous cross-

18

examination on her obvious bias as Alqsous's fiancée and her possible implication in wrongdoing. This is a classic example of sound trial strategy entitled to deference. *See Rayborn v. United States*, 489 F. App'x 871, 879 (6th Cir. 2012).

Another theme running through Alqsous's motion is that his counsel failed to offer testimony of the many good deeds Alqsous performed while working at MetroHealth. According to Alqsous, Wyatt would have a testified that Alqsous was "always present and helpful[.]" (Doc. No. 693, at 5.)[3] Similarly, he suggests that another dental hygienist, Keila Beagle, would have testified that Alqsous "would sometimes provide free services if a patient couldn't afford it" (*id.* at 6), and Hannan Hamada—a patient at Alqsous's private clinic—would have "attested to [his] character; that he offered her payment options, including helping her personally to pay for root canals; that he would pick[] her up to help her into [her] wheelchair, etc[.]" (*Id.* at 5.)

But consistent with the Court's ruling at trial, Alqsous would not have been permitted to offer any of his proposed "good acts" testimony, as such evidence would not have negated the charges or made it any more likely that he acted without criminal intent on the dates set forth in the Indictment.[4] (Doc. No. 319 (Opinion), at 6–11 (collecting cases).) *See United States v. Dimora*,

---

[3] Additionally, Alqsous claims that Wyatt would have testified that MetroHealth "accepted Medicaid and Ryan White Fund so many patients seen were HIV positive; many patients [were] mental ill or drug-addicted[.]" (Doc. No. 693, at 4.) Alqsous fails to explain why evidence about MetroHealth's patients' other medical conditions would have been relevant to his defense.

[4] Alqsous also faults trial counsel for failing to "sufficiently interview" Matthew Kirlough, a dentist who left MetroHealth in 2013. (Doc. No. 693, at 8.) In addition to attesting to the long hours worked by Alqsous, Alqsous claims Kirlough would have further testified that Alqsous "provide[d] high quality care to his patients." (*Id.*) As set forth above, neither the number of hours nor the quality of Alqsous's care were at issue or relevant to the charges. Alqsous also claims that counsel did not address the flextime policy with Kirlough, suggesting that counsel did not understand it. (*Id.*) The Court disagrees, as the thorough cross-examinations of Drs. Connors, El-Shami, Elrawy, and others demonstrated that trial counsel fully understood the charges, including the "stream of benefits" scheme. In much the same way, his complaint that counsel failed to cross-examine Dr. Connors with the testimony of Daniel Lewis (who testified about a hospital-wide policy that defined full-time as those positions "budgeted to work 60 to 80 hours biweekly") is without merit. (Doc. No. 392 (Trial Transcript), at 98–99.) Lewis was testifying about hospital-wide *budgeting* for all positions, not an *employment policy* specific to physicians and dentists, as concerned Dr.

750 F.3d 619, 630 (6th Cir. 2014) (It is well-established that "prior 'good acts' generally may not be used to show a predisposition not to commit crimes" and so are not admissible).

And, as was the case with the some of the other proposed testimony, some of the "good acts" evidence might actually have hurt Alqsous's case. Alqsous suggests that Hamada would also have testified that she "usually had a 4–6 months' wait to get an appointment" at MetroHealth, "but was able to see Dr. Alqsous right away at his own practice[.]" (Doc. No. 693, at 5.) As the government observes, this testimony might have actually been detrimental to Alqsous, as it highlights one way Alqsous's failure to be present at MetroHealth five days a week hampered MetroHealth's ability to see patients in a timely fashion. Counsel cannot be considered ineffective for failing to offer potentially damaging testimony. *See Goldsby v. United States*, 152 F. App'x 431, 436 (6th Cir. 2005) (finding no ineffective assistance of counsel where defense counsel elected not to call a witness who would have likely supported the government's theory that the drugs belonged to the defendant).

Alqsous also complains that trial counsel "failed to reach out to Hussein Elrawy to secure an interview, but rather surprisingly instead reached out to Attorney Mark Marien[,]" whom Alqsous claims "was not attorney of record for Elrawy but who allegedly represented Elrawy in interviews with the Government to which no 302s were ever produced." (Doc. No. 693, at 9.) The parties dispute whether Attorney Marien was representing Elrawy at the time, which would have constrained defense counsel's ability to deal directly with Elrawy, and the government insists that

---

Connors's testimony. Moreover, counsel for Hills did cross-examine Dr. Connors on the hospital-wide budgeting policy of which Lewis addressed, to which Dr. Connors drew the distinction between the work expectations of doctors (and dentists) and other employees. (*See* Doc. No. 404, at 143–44.) There simply is no merit to Alqsous's argument that Dr. Connors's testimony was not tested in this fashion.

it did provide the defense with "all of the FBI interview reports regarding Elrawy, as well as any other Jencks or *Giglio* material that applied to him." (Doc. No. 708, at 21.) The Court need not resolve these factual disputes because Alqsous has failed to demonstrate any prejudice. *See Dibble v. United States*, 103 F. App'x 593, 596 (6th Cir. 2004) (affirming the district court's denial of the petitioner's § 2255 motion when the petitioner failed to "identify any prejudice that she suffered as a result of counsel" failing to call a witness). The record is clear that counsel for Alqsous and counsel for his co-defendants thoroughly cross-examined Elrawy, exploring his role in the charged conduct and his obvious bias as an unindicted co-conspirator. Indeed, Attorney Joseph Klammer's[5] cross-examination, alone, spanned nearly 85 pages of trial transcript, covered a variety of topics relating to the dental residency program, and explored potential alternate reasons for Hill's decision to refer MetroHealth patients to Alqsous's private clinic. (Doc. No. 407 (Trial Transcript), at 104–189.) Alqsous fails to demonstrate how a pre-trial interview would have made this cross-examination any more effective.

Under the *Strickland* standard, it is presumed that an attorney's decision not to call a particular witness was based upon a sound trial strategy, absent evidence in the record to the contrary. *Hutchinson v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002); *see Rayborn*, 489 F. App'x at 878 (holding "whether to call a witness . . . [is a] classic question[] of trial strategy that merit[s] *Strickland* deference"). Counsel's performance is given "great deference" and a "presumption of reasonableness[,]" such that when choosing to call (or not call) a witness, "[f]or counsel's [decision] to rise to the level of constitutional ineffectiveness, the decision . . . must have been completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense

---

[5] Attorney Joseph Klammer was one of Alqsous's trial attorneys.

strategy." *Moore v. Mitchell*, 708 F.3d 760, 767 (6th Cir. 2013) (quotation marks and citations omitted) (alterations in original). Alqsous has not overcome the presumption that counsel's failure to call witnesses who might have offered testimony that was irrelevant, cumulative, or harmful represented anything other than sound strategy.

Finally, to the extent Ground One includes a claim that Alqsous "wanted to testify" but was thwarted by his counsel (*see* Doc. No. 693-1 (Declaration of Sari Alqsous) ¶ 22), it is directly refuted by the record. After the Court explained Alqsous's right to testify and to offer evidence on his behalf, Alqsous stated on the record that he had voluntarily made the decision not to testify after receiving sufficient time to discuss the matter with his attorneys. (Doc. No. 410 (Trial Transcript), at 154–58.)

Accordingly, Ground One is without merit and is denied.

### C.  Effectiveness During Plea Negotiations (Ground Two)

Alqsous also claims trial counsel was ineffective for failing to advise him regarding "the benefits of pleading guilty or the true risks of going to trial." (Doc. No. 693, at 9.) In support of Ground Two, he suggests that "had [he] been made aware of [his] sentencing exposure, by going to trial, [he] would have opted to plead guilty." (*Id*. at 9–10.) He maintains that "[a]t no point prior to trial was it explained to me by [Attorney John] Mitchell or anyone else, that if found guilty, I could receive a sentence of twelve or more years. Nor, was it ever explained to me what the United States would have to prove in order to obtain [a] guilty verdict. The magnitude of the charges and their components against the evidence that the government presented were never discussed at any time." (Doc. No. 693-1 ¶ 17.)

The Court's consideration of Ground Two is governed by the Supreme Court's decision in

*Lafler v. Cooper*, 566 U.S. 156, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012). There, trial counsel advised a state court defendant to reject a favorable plea offer on the charge of assault with intent to commit murder, incorrectly informing his client that the state would be unable to establish his intent to murder because the victim was shot below the waist. *Lafler*, 566 U.S. at 161. The defendant eventually went to trial after rejecting the plea offer of a custody sentence of 51–85 months, and he was convicted on all counts with the result being a mandatory minimum custody sentence of 185–360 months. *Id.*

After noting that the Sixth Amendment right to effective assistance of counsel applied to advice given during the post-indictment plea process, and further observing that counsel's advice led to the rejection of a plea offer, the *Lafler* Court held, to establish ineffectiveness under these circumstances, a defendant must show that:

> but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Id.* at 164. In *United States v. Giamo*, the district court observed that the *Lafler* standard can be broken down into a three-part test that a defendant must meet to establish the prejudice prong of *Strickland* in the context of a rejected plea offer: "(1) the plea offer would have been presented to the Court, such that the defendant would have accepted the plea and the prosecution would not have rejected it; (2) the Court would have accepted it; (3) and that the conviction, sentence, or both, would have been less severe than what was imposed." *United States v. Giamo*,  153 F. Supp. 3d 744, 761 (E.D. Pa. 2015) (citing *Lafler*, 559 U.S. at 164; *Frye*, 566 U.S. at 147); *see McGowan v. Burt*, 788 F.3d 510 (6th Cir. 2015) (applying standard from *Lafler* (citing *Lafler*, 559 U.S. at

23

164)). Because there is no right to a plea offer, and in light of the facts a defendant must show to demonstrate prejudice in this context, the Sixth Circuit has cautioned that "[a] petitioner raising this variety of *Strickland* claim [] faces a formidable standard[.]" *Byrd*, 940 F.3d at 257.

The crux of Alqsous's second ground for relief is that trial counsel led him to believe that his potential exposure, if he were to go to trial, was no more than three years.[6] (Doc. No. 693-1 ¶¶ 15, 17–18.) This contention is belied by the record.

Prior to trial, the Court conducted a colloquy with each defendant in accordance with *Missouri v. Frye*. After determining that the government never extended to Alqsous a formal plea offer (*see* Doc. No. 391 (Trial Transcript), at 3–4),[7] the following exchange took place.

> The Court: So is it fair to say, Dr. Alqsous, that you have been informed of the terms and conditions of the negotiations between you and the government and that you've been informed by your lawyer?
>
> Defendant Alqsous: Yes, Your Honor.
>
> The Court: Have you considered and rejected any offers that may have been made after you had adequate opportunity to discuss the matter with your attorney? And maybe, let me rephrase that. I understand that no formal offer was made, correct?
>
> Mr. Mitchell: That is correct, Your Honor. But I think the question you're asking is absolutely applicable and appropriate.

---

[6] To the extent Ground Two is premised on advice Alqsous received from counsel *prior to indictment* (*see, e.g.*, Doc. No. 693-1 ¶¶ 7–10), this ground for relief is denied for the same reason the Court denied the portion of Ground One related to any pre-indictment representation: the right to counsel "does not attach until the initiation of adversary judicial proceedings." *Kennedy v. United States*, 756 F.3d 492, 493 (6th Cir. 2014) (quoting *United States v. Gouveia*, 467 U.S. 180, 187–90, 104 S. Ct. 2292, 81 L. Ed. 2d 146 (1984)). There is, therefore, no Sixth Amendment right to effective assistance of counsel during preindictment plea negotiations. *Turner v. United States*, 885 F.3d 949, 953 (6th Cir. 2018) ("We . . . affirm our long-standing rule that the Sixth Amendment right to counsel does not extend to preindictment plea negotiations.") The Sixth Circuit has recognized that nothing in the ruling of *Lafler* changed this long-standing rule that preindictment negotiations fall outside the protection of the Sixth Amendment. *See Kennedy*, 756 F.3d at 494 (citing *Lafler*, and noting that "[h]ad the Supreme Court erased the line between preindictment and postindictment proceedings for plea negotiations, it surely would have said so").

[7] The Court permitted the parties to place under seal a copy of an email chain between Attorney Mitchell (Alqsous's attorney) and AUSA Om Kakani summarizing the status of pretrial plea negotiations. (*Id.* at 4–6; *see* Doc. No. 315.) Contemporaneously with the plea negotiations, Attorney Mitchell forwarded the email to Alqsous, who agreed that the summary was consistent with his recollection of the negotiations. (*See* Doc. No. 315, at 1.)

The Court: So have you considered and rejected any offer that was made to you?

Defendant Alqsous: Yes, Your Honor.

The Court: Have you had adequate time to discuss with your attorney the offer that has been made to you?

Defendant Alqsous: Yes, Your Honor.

The Court: Do you need additional time to discuss the offer?

Defendant Alqsous: No, Your Honor.

The Court: Okay. Are you aware of the statutory penalties for the offenses for which you have been charged?

Defendant Alqsous: Yes, Your Honor.

The Court: And are you also aware of the advisory guideline sentence or other sentence --- or let me say it this way. Are you aware of the advisory guideline sentence that might apply in your case?

Defendant Alqsous: Correct, Your Honor.

The Court: Have you had discussions with your attorney regarding that?

Defendant Alqsous: Yes, Your Honor.

(Doc. No. 391, at 6–8.)

The Court then asked the government to review on the record the maximum statutory penalties for each count, after which Alqsous indicated that he understood the statutory penalties. (*Id*. at 9–11.) Thereafter, the Court asked the government to provide its estimate of the advisory sentencing guideline range appliable to Alqsous. The government estimated that Alqsous' offenses level would be 40 and his criminal history category would be I, thereby resulting in an estimated advisory sentencing range of 292 to 365 months. (*Id*. at 12–13.) The Court then turned to Alqsous and asked, "do you understand what the government just represented relative to their estimate as

25

to the advisory guideline sentencing range should you be convicted of all counts?" (*Id*. at 13.) Alqsous replied, "Yes, Your Honor." (*Id*.) He also acknowledged that he understood when the Court explained that the government's estimate was "just that, it [was] an estimate, and that it can change in light of further developments of the facts of [the] case." (*Id*.) Additionally, Alqsous confirmed that he had been given enough time to "discuss resolving the case with [his] attorney" and that it was his "desire to proceed to trial in light of what may have been offered to [him by the government]." (*Id*. at 13–14.) The Court also asked Alqsous if any "further explanation [was] needed from [his] attorney relative to the offer that was made [during the exchanges between the AUSAs and defense counsel,]" to which Alqsous responded: "No, Your Honor. [Counsel] explained it to me." (*Id*. at 15.) When counsel was asked if there was anything further they would like to add, Attorney Mitchell said "I don't think so, Your Honor. I think that we've had full and open discussions about the case. Mr. Klammer, I would note for the record, is present in court as well. He participated in those discussions also." (*Id*. at 14.) At the conclusion of the colloquy, the Court found that Alqsous had been informed of the likely consequences if convicted following trial, and that he knowingly and voluntarily elected to go to trial. (*Id*. at 15–16.)

As Alqsous conceded during his colloquy, his counsel discussed with him the nature of the plea discussions with the government, the application of the sentencing guidelines, and the potential sentencing exposure he faced should he proceed to trial. Moreover, he was advised of the government's estimation of the applicable guideline range should he be convicted at trial of all of the charged offenses. While he suggests that he was free to ignore this estimate and rely on what he believes was an earlier erroneous estimate by trial counsel (*see* Doc. No. 730, at 5), this is not the law. Rather, "[w]hen an ineffective-assistance claim is based on misleading information

regarding the consequences of a plea, a proper plea colloquy is generally deemed to cure any misunderstanding the defendant may have had about the consequences of the plea." *United States v. Pola*, 703 F. App'x 414, 423 (6th Cir. 2017) (citing *Ewing v. United States*, 651 F. App'x 405, 410 (6th Cir. 2016) (further citation omitted)); *see Thompson v. United States*, 728 F. App'x 527, 535 (6th Cir. 2018) (approving of observation that the "Sixth Circuit has consistently upheld the validity of the plea-colloquy advisement of rights to preclude later claims of misunderstanding alleged to result from misleading advice"). Having engaged in the Court's pretrial *Frye* colloquy, Alqsous cannot claim in good faith that he believed that his potential sentencing exposure was limited to three years imprisonment.

Based on the record, Alqsous also cannot claim that, if he had known the truth about the amount of time he was facing, he would have accepted a plea offer from the government. As an initial matter, the record is clear that the government never extended a formal plea offer to Alqsous. Moreover, while he now claims that he would have accepted a plea offer if his counsel had secured one, it is clear from the record that Alqsous was unwilling to consider a negotiated plea that involved *any* period of imprisonment. In a pretrial email exchange attached to Alqsous's reply, Attorney Mitchell advised Alqsous that the government could not "envision a plea agreement that does not result in a Zone D guideline that would require a prison sentence if the Judge followed the sentencing guidelines." (Doc. No. 730-4 (Email), at 1.) By way of example, counsel explained that, under the guidelines, if the offense level was 25, a Zone D sentencing range would be 57 to 71 months. (*Id.*) Counsel continued that he understood that Alqsous was not interested in "any plea beyond one that would be a 'business decision' (i.e. a misdemeanor or offense with no jail time) so I told AUSA Kakani that I expect to try the case." (*Id.*) Attorney Mitchell assured Alqsous that

27

his decision not to consider even the possibility of a period of incarceration was not a "criticism" of him, but that it made no sense to pursue further negotiations based on the government's stated position and Alqsous's reluctance to consider a sentence with a custody term. (*Id*.)

This was consistent with the pretrial email exchange between Attorney Mitchell and AUSA Kakani, in which Attorney Mitchell summarized the status of pretrial plea negotiations. Alqsous was copied on this email, and he confirmed that it was his recollection that the government would have required that any sentence resulting from a plea to fall within Zone D of the sentencing guidelines. (*See* Doc. No. 315.) These emails constitute further record evidence that trial counsel discussed sentencing exposure with Alqsous.

Ultimately, the Court finds that Alqsous has failed to meet the "formidable" standard of establishing a *Lafler*-type claim of ineffective assistance of counsel. *See Byrd*, 940 F.3d at 257. Even if the Court assumes that any sentence Alqsous may have received upon a negotiated plea (if one had been extended) would have been less than the sentence he received following the trial (*Lafler's* third prong), the record resoundingly refutes any claim that the government would have extended a plea offer that Alqsous would have accepted (*Lafler's* first prong). Because Alqsous has failed to demonstrate that he received constitutionally ineffective advice from his trial counsel during the plea process and that he was prejudiced by such advice, Ground Two is denied.[8]

---

[8] The Court also questions whether it would have been able to accept Alqsous's guilty plea (*Lafler's* second requirement), and whether it would have been able to credit him with acceptance of responsibility at sentencing. A district court must ensure that all guilty pleas are entered into knowingly, intelligently, and voluntarily. *See United States v. Webb*, 403 F.3d 373, 378 (6th Cir. 2005) ("A guilty plea is valid if it is entered knowingly, voluntarily, and intelligently by the defendant." (citing *Brady v. United States*, 397 U.S. 742, 748, 90 S. Ct. 1463, 25 L. Ed. 2d 747 (1970))). Additionally, § 3E1.1(a) of the Sentencing Guidelines states that "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense," the district court must "decrease the offense level by 2 levels." U.S.S.G. § 3E.1(a). While Alqsous represents that he would have pleaded guilty if he had received adequate advice, he hedges his willingness to do so. Specifically, in his declaration, Alqsous avers that he would have "opted to plead guilty *regardless of my personal feelings towards my guilt or innocence*." (Doc. No. 693-1 ¶ 23 (emphasis added).) Given

### D.  Failure to Call an Expert Witness (Ground Three)

In his motion to vacate, Alqsous claimed that his trial counsel was ineffective for failing to retain and call an expert on "dentistry billing practices and procedures." (Doc. No. 681, at 7.) In his subsequently filed memorandum in support, he elaborated upon this claim, suggesting that an expert could have testified that Alqsous's pattern of work was "within normal parameters[,]" could have addressed Medicare billing procedures for dentures, and could have "corroborated fact witnesses[.]" (Doc. No. 693, at 10.) He also represented that an expert could have testified that Alqsous "accrued over $130,000 in sick time[.]" (*Id.*) While the memorandum referenced an expert report from Dr. Syed Bilawal Ali Shah—which Alqsous said addressed what constitutes full-time work under the Fair Labor Standards Act, and would have discussed how the term "full-time" is "subject to variation" in the medical field—no such expert report was attached to the memorandum. (*See id.*) Alqsous later advised the Court that he "no longer is relying on Dr. Syed Bilawal Ali Shah for any purpose." (Doc. No. 704 (Notice of Errata), at 1.)

According to the government, the fact that Alqsous cannot identify any expert on "dentistry billing procedures," despite having the benefit of almost six years' of hindsight since his trial, means that this claim fails both prongs of the *Strickland* test." (Doc. No. 708, at 25 (citing *Winters v. United States*, 716 F.3d 1098, 1104 (8th Cir. 2013) ("This speculative § 2255 claim is without merit for many reasons, the most obvious being that Winters failed to identify an expert and provide evidence of the testimony that expert would have given at the suppression hearing or at trial.")).) Alqsous responds that the government has failed to identify any binding authority

---

his apparent unwillingness to admit to the conduct comprising the offenses, it is likely that the Court would not have accepted Alqsous's guilty plea or would not have credited Alqsous with acceptance of responsibility at sentencing.

requiring him to identify an expert. (Doc. No. 730, at 7.)

True as that may be, binding authority in the Sixth Circuit requires a petitioner to support his motion to vacate with more than conclusory statements regarding counsel's discovery failings and unsubstantiated arguments that a different approach would have yielded a more favorable result. *Green*, 454 F.2d at 53; *see Keith v. Mitchell*, 455 F.3d 662, 672 (6th Cir. 2006) (holding that a habeas petitioner's claim that trial counsel was ineffective for failing to call an expert witness cannot be speculative); *see also United States v. Holt*, No. 95-5173, 85 F.3d 629 (Table), 1996 WL 262466, at *9 (6th Cir. May 15, 1996) (recognizing that the court is not required to engage in "unguided speculation into the value of omitted testimony by hypothetical witnesses"). Rather, Alqsous bears the burden of demonstrating that there is a "reasonable probability that," but for trial counsel's alleged error in failing to retain an expert, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 696.

In *United States v. Stegawski*, 687 F. App'x 509, 514 (6th Cir. 2017), the Sixth Circuit rejected a petitioner's claim that his trial counsel's failure to acquire an expert constituted ineffective assistance, noting that petitioner "never explains how a medical expert could have refuted [the] overwhelming evidence of guilt." The court explained that the petitioner "asks us 'to take the leap of faith' that an uncalled and unnamed medical expert—yet to be found even now— would somehow have rebutted" the testimony of the government's expert. *Id.*; *see, e.g., United States v. Valencia*, 188 F. App'x 395, 400 (6th Cir. 2006) (holding that a petitioner must "provide some evidence that trial counsel's decision not to [hire an expert to] have the drugs tested was unreasonable[,]" and finding that "speculative assertions" regarding the evidence were insufficient). Similarly here, Alqsous fails to demonstrate how an unnamed expert's testimony

could have "corroborated fact witnesses[.]" (Doc. No. 693, at 10.) Alqsous also fails to explain how his accumulation of sick leave or expert testimony regarding his work pattern would have made it any less likely that he received employment-related benefits in exchange for bribes given to Hills. Furthermore, whether flexible schedules are well-accepted in the medical profession, or are even a good idea, is equally irrelevant to the question of whether Alqsous engaged in bribery.

Moreover, as discussed above, trial counsel thoroughly cross-examined the government's witnesses on flexible schedules and other employment-related benefits that Alqsous and his co-defendants allegedly received. "[T]he failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel. . . . even if the wisdom of such an approach is debatable[.]" *Samatar v. Clarridge*, 225 F. App'x 366, 372 (6th Cir. 2007); *see Esparza v. Sheldon*, 765 F.3d 615, 624 (6th Cir. 2014) (rejecting the petitioner's argument that his attorney could have "impeached [an adverse witness] more effectively by calling an expert" because the decision to rely on cross-examination rather than an expert witness "precisely the sort of tactical judgment *Strickland* counsels against second-guessing" (citing *Strickland*, 466 U.S. at 689)).

As the Sixth Circuit recently observed: "When reviewing the adequacy of counsel's performance, the Supreme Court has 'often explained that strategic decisions—including whether to hire an expert—are entitled to a 'strong presumption' of reasonableness." *Clardy v. Pounds*, 126 F.4th 1201, 1209 (6th Cir. 2025) (quoting *Dunn v. Reeves*, 594 U.S. 731, 739, 141 S. Ct. 2405, 210 L. Ed. 2d 812 (2021) (per curiam) (citation omitted)); *see also Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001) (noting that "[a] strategic decision cannot be the basis for a claim of ineffective assistance of counsel unless counsel's decision is shown to be so ill-chosen that it

permeates the entire trial with obvious unfairness" (citation omitted)). Alqsous has not demonstrated that counsel's failure to hire an expert witness and rely, instead, on vigorous cross-examination, was constitutionally ineffective. *See generally Harrington v. Richter*, 562 U.S. 86, 106, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011) ("There are . . . countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.") Ground Three, therefore, is denied.

### E.  Failure to Move for a Severance (Ground Four)

Alqsous also faults his trial counsel for failing to move for a severance. According to Alqsous, "counsel never discussed let alone moved for a severance, and this despite the fact that Dr. Hills, the lead defendant, had done so." (Doc. No. 693, at 12 (citing Doc. No. 206 (Hills Motion to Sever)).) Prior to trial, Hills moved for a severance based on a concern that the introduction of pre-trial statements made by Alqsous during a proffer session would, without the benefit of cross-examination, violate Hills's Sixth Amendment rights, as set forth in *Bruton v. United States*, 391 U.S. 123, 132, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968). (*See* Doc. No. 206, at 4–6.) The Court denied the motion without prejudice upon the government's representation that Alqsous's statements would not be introduced in its case-in-chief and Hills's concession that, in any event, any potential *Bruton* violations could be avoided through redaction of his name from the statements. *See United States v. Hills*, 1:16-cr-329, 2018 WL 1621088, at *2 (N.D. Ohio Apr. 4, 2018). Of course, the basis for Hills's severance motion was obviously not available to Alqsous.

Alqsous also does not suggest that he was improperly joined with Hills and his other co-defendants, and concedes (as he must) that "joint trials are favored." (*Id.* at 11 (quoting *Stanford v. Parker*, 266 F.3d 442, 459 (6th Cir. 2001) (further citation omitted).) Still, he argues that trial

counsel should have moved for a permissive severance, noting that Hills was the "lead defendant" and the "central actor in the conspiracy[.]" (*Id*. at 12.) Alqsous also observes that he was not even hired until after Hills instituted his flex time policy, arguing that it made no sense "that he would pay bribes for a policy that already was in effect when he was hired." (*Id*.)

Federal Rule of Criminal Procedure 8(b) permits "joinder in an indictment of defendants 'alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.'" *United States v. Swift*, 809 F.2d 320, 322 (6th Cir. 1987) (quoting Fed. R. Crim. P. 8(b)). This rule is "broadly construed in favor of initial joinder[.]" *Id*. (quotation marks and citation omitted). "A group of acts or transactions is logically interrelated, for instance, if the acts or transactions are part of a common scheme or plan." *United States v. Johnson*, 763 F.2d 773, 776 (6th Cir. 1985). When defendants are joined for participating in the same series of actions, such as in a conspiracy, the defendants may be charged in one or more counts and all defendants need not be charged in each count. *See United States v. Warner*, 690 F.2d 545, 551 (6th Cir. 1982) ("It is well settled that joinder is proper under Rule 8(b) where an indictment charges multiple defendants with participation in a single conspiracy." (quotation marks and citation omitted)).

"As a general rule, persons jointly indicted should be tried together because 'there is almost always common evidence against the joined defendants that allows for the economy of a single trial.'" *United States v. Lopez*, 309 F.3d 966, 971 (6th Cir. 2002) (quoting *United States v. Phibbs*, 999 F.2d 1053, 1067 (6th Cir. 1993)); *see Gardiner*, 463 F.3d at 472. "Once defendants have been properly joined under Federal Rule of Criminal Procedure 8(b), a 'strong showing of prejudice' is required to justify severance." *United States v. Hessling*, 845 F.2d 617, 619 (6th Cir. 1988)

33

(quoting *United States v. Reed*, 647 F.2d 678, 689 (6th Cir. 1981)); *see also United States v. Scaife*, 749 F.2d 338, 344 (6th Cir. 1984) (showing of prejudice must be made demonstrating that the jury will be unable to separate and treat distinctively evidence that is relevant to each particular defendant on trial). Severance should be granted "only if there is a serious risk that joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539, 113 S. Ct. 933, 122 L. Ed. 2d 317 (1993). "Even where the risk of prejudice is high, 'less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.'" *United States v. Driver*, 535 F.3d 424, 427 (6th Cir. 2008) (quoting *Zafiro*, 506 U.S. at 539).

Moreover, "[t]he fact that defendant may have a better chance at acquittal if his trial were severed does not require the judge to grant his motion [to sever]: the defendant must show 'substantial,' 'undue' or 'compelling prejudice.'" *United States v. DeFranco*, 30 F.3d 664, 669–70 (6th Cir. 1994) (quoting *United States v. Warner*, 971 F.2d 1186, 1196 (6th Cir. 1992)); *see Stanford*, 266 F.3d at 458. Nor does he have a right to a severance merely because his defense is antagonistic to that of his co-defendants. *Zafiro*, 506 U.S. at 538; *Stanford*, 266 F.3d at 458. Likewise, a spillover of evidence from one defendant to another generally does not require severance. *United States v. Anderson*, 89 F.3d at 1306, 1312 (6th Cir. 1996); *see Lopez*, 309 F.3d at 971. In fact, "a defendant is not entitled to severance simply because the evidence against a codefendant is far more damaging than the evidence against him." *United States v. Causey*, 834 F.2d 1277, 1288 (6th Cir. 1987); *see Driver*, 535 F.3d at 427.

Here, had trial counsel sought a severance, the Court would have found no valid basis for granting the motion. Alqsous and his co-defendants were jointly indicted for participating in a

variety of unlawful schemes exploiting their employment at MetroHealth at the expense of Cuyahoga County taxpayers and their patients, including bribery, fraud, obstruction of justice, and racketeering. While Alqsous argues that Hills was the "lead defendant" and "central actor" in the conspiracies, neither consideration would have supported severance.[9] *See Warner*, 971 F.2d at 1196 ("A defendant is not entitled to severance because the proof is greater against a co-defendant" (citation omitted)). And Alqsous's arguments ignore the considerable evidence offered at trial— including witness testimony, text messages, financial records, photographs, and recordings— showing his own extensive involvement in the conspiracies. While Alqsous implies that he was a mere victim of Hills's scheming, the evidence at trial told a different story.

Alqsous has also failed to explain why limiting instructions would not have cured the possible prejudice from any disparities in the proofs offered at trial. *See Driver*, 535 F.3d at 427. Indeed, the jury was properly instructed that they were to separately consider the evidence against each defendant on each charge. Consistent with the Sixth Circuit Pattern Instruction § 2.01C, the jury was charged as follows:

> And in our system of justice, guilt or innocence is personal and individual. It is your duty to separately consider the evidence against each defendant on each charge and to return a separate verdict for each one of them. For each one, you must decide whether the government has presented proof beyond a reasonable doubt that a particular defendant is guilty of a particular charge. Your decision on any one defendant or one charge, whether it is guilty or not guilty, should not influence your decision of any of the other defendants.

---

[9] Alqsous's argument that it makes no sense that he would bribe Hills for a benefit that was established before he was hired at MetroHealth would also not have convinced the Court to sever his case, as this argument, at best, only goes to the weight of the evidence against Alqsous. It is not necessary that each co-defendant be equally involved in all aspects of a conspiracy in order to be tried together, and this argument provides no basis for severance. *See Driver*, 535 F.3d at 427 (no error in failing to sever defendant, despite the fact that he was not involved in various acts of violence perpetrated by various co-conspirators); *see also United States v. Vanaman*, 12 F. App'x 222, 234 (6th Cir. 2001) (not plain error to fail to sever defendant, even though he was not involved in all aspects of the conspiracy).

(Doc. No. 412, at 46–47.) As proof that the jury was able to follow this instruction and separately consider each defendant's involvement in each of the charged offenses as instructed, Alqsous was acquitted of Counts 9–12, charging money and property mail fraud, in violation of 18 U.S.C. § 1349, while Hills, who was also charged in these counts, was convicted. (*Compare* Doc. No. 338, at 9–12 *with* Doc. No. 337, at 5–8.)

Ultimately, the Court would have found that the complexity and multi-faceted nature of this conspiracy strongly favored a joint trial. Indeed, all of the evidence offered at trial—with the possible exception of the limited evidence offered to support Hills's separate charges of tax evasion involving his failure to properly report the proceeds from the charged conspiracies—would have been admissible against Alqsous had he been tried separately. *See Warner*, 971 F.2d at 1196 (severance should not be granted where the same evidence is admissible against all defendants (citation omitted)). Moreover, the fact that limiting instructions were available and ultimately employed to ensure separate consideration of the culpability of each defendant and each crime charged in this conspiracy would have made any motion by Alqsous to sever unlikely to prevail. Counsel cannot be considered ineffective for failing to file such a motion, nor can Alqsous establish that he was prejudiced from their failure to do so. Ground Four is denied.

Because each ground asserted in Alqsous's motion to vacate (Doc. No. 681) is without merit, the motion to vacate is denied.

## IV.   ALQSOUS'S AMENDED MOTION TO VACATE

The amended motion to vacate also raised four separate grounds for relief, each tied to a recent, but different, Supreme Court decision. Continuing with the numbering from the original motion to vacate, Ground Five was premised on *Snyder v. United States*, 603 U.S. 1, 10, 144 S.

Ct. 1947, 219 L. Ed. 2d 572 (2024), which held that 18 U.S.C. § 666 does not prohibit the payment of gratuities to public officials. Ground Six was based on *Fischer v. United States*, 603 U.S. 480, 498, 144 S. Ct. 2176, 219 L. Ed. 2d 911 (2024), which limited the reach of 18 U.S.C. § 1512(c)(2). Ground Seven relied on the ruling in *Ciminelli v. United States*, 598 U.S. 306, 309, 143 S. Ct. 1121, 215 L. Ed. 2d 294 (2023), rejecting the "right-to-control" theory for wire fraud. Ground Eight, the final ground for relief, relied on the ruling in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412–13, 144 S. Ct. 2244, 219 L. Ed. 2d 832 (2024), overruling *Chevron, U.S.A., Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984), and holding that courts may not defer to an agency's interpretation of a statute.

### A. The Concurrent Sentence Doctrine (Ground Five)

As an initial matter, the government argues that Ground Five, resting on the Supreme Court's ruling in *Snyder*, is barred by the concurrent sentence doctrine. (Doc. No. 747, at 8.) The Court finds that, whether it employs the concurrent sentence doctrine or merely relies on the plain language of § 2255, Ground Five entitles Alqsous to no relief.

The "concurrent sentence doctrine" invests a court with discretion to decline to hear a substantive challenge to a conviction "when the sentence on the challenged conviction is being served concurrently with an equal or longer sentence on a valid conviction." *Winn v. Renico*, 175 F. App'x 728, 731–32 (6th Cir. 2006) (citation omitted); *see Raines v. United States*, 898 F.3d 680, 687 (6th Cir. 2018) (similar) (quotation marks and citations omitted); *United States v. Hughes*, 964 F.2d 536, 541 (6th Cir. 1992) (similar) (citation omitted). The doctrine "acts as a discretionary bar to judicial review[.]" *Pillette v. Berghuis*, 408 F. App'x 873, 886 n.8 (6th Cir. 2010) (citations omitted). "It aims to conserve judicial resources by permitting courts to avoid adjudicating issues

when a favorable ruling could not affect prison time or alleviate some other harm." *Amaya v. United States*, 71 F.4th 487, 491 (6th Cir. 2023) (citing *Kassir v. United States*, 3 F.4th 556, 561–62 (2d Cir. 2021)).

In *Amaya*, the Sixth Circuit addressed an appeal from a district court's decision dismissing a § 2255 motion challenging a conviction under 18 U.S.C. § 924(c) based on the Supreme Court's ruling in *United States v. Davis*, 588 U.S. 445, 139 S. Ct. 2319, 204 L. Ed. 2d 757 (2019). *Amaya*, 71 F. 4th at 489. In dismissing the petition, the district court "invoked the 'concurrent sentence doctrine' and denied relief without reaching the merits." *Id.* On appeal, the Sixth Circuit began with the plain language of § 2255, noting that the "statute limits its reach to 'prisoner[s] *in custody* under sentence of a court established by Act of Congress *claiming the right to be released . . . .*'" *Id.* (quoting § 2255) (emphasis added by *Amaya*). Based on the italicized language, the court found that the petitioner was not entitled to relief unless he was claiming the right to be released from custody. *Id.* The court reasoned that, because Amaya was serving two unchallenged life sentences, the vacation of his § 924(c) conviction would not entitle him to immediate release. *Id.* The Sixth Circuit affirmed the district court's dismissal, finding that Amaya had not "shown the kind of prejudice that could state a claim under the plain terms of § 2255 (whether or not the concurrent sentence doctrine would otherwise apply)." *Id.* at 491.

In the present case, Alqsous received concurrent sentences of 151 months for the following counts: Count 1 (RICO conspiracy), Count 2 (Hobbs Act conspiracy), Count 4 (conspiracy to commit honest services fraud), Count 8 (conspiracy to commit money, property mail, and wire fraud), Count 28 (conspiracy to commit honest services fraud), and Count 29 (conspiracy to obstruct justice). (Doc. No. 517, at 2.) Alqsous's *Snyder* challenge only applies to Count 3

38

(conspiracy to commit bribery concerning programs receiving federal funds under § 371) and Count 5 (bribery concerning programs receiving federal funds under § 666), for which he received sentences of 60 and 120 months, respectively.[10] (*See id.*) Even if the Court were to vacate Counts 3 and 5, Alqsous would still be required to serve his concurrent 151-month sentences; including his sentence for Count 1 (RICO conspiracy), which is entirely unaffected by the amended motion to vacate. Because any relief the Court could render with respect to Ground Five "cannot affect [Alqsous's] release from custody," it is denied.

### B. Timeliness (Ground Seven)

On May 11, 2023, the Supreme Court issued its decision in *Ciminelli*, and this decision serves as the foundation for Ground Seven of the amended motion. Because the amended motion was not filed within one year of the ruling in *Ciminelli*, the government argues that it is time-barred under 28 U.S.C. § 2255(f)(3).[11] (Doc. No. 747, at 20–22.)

The Anti-Terrorism and Effective Death Penalty Act (AEDPA) "provides a one-year statute of limitations for filing a federal habeas petition." *Cleveland v. Bradshaw*, 693 F.3d 626, 631 (6th Cir. 2012). Specifically, a prisoner must file his § 2255 motion within one year of the latest of:

(1) the date on which the judgment of conviction becomes final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court,

---

[10] As discussed *infra*, *Snyder* does not extend to other statutes, nor does the ruling in *Snyder* apply to any other count.

[11] Because the amended motion was filed within one year of the Supreme Court decisions that serve as the premise for Grounds Five, Six, and Eight, the government does not challenge the timeliness of these grounds under § 2255(f)(3). (Doc. No. 747, at 22 n.4.)

if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f).

Alqsous does not contest that his amended petition was filed more than one year after the Supreme Court issued its decision in *Ciminelli*. Nor does he suggest that one of the other triggering events in § 2255(f) is applicable. Rather, he claims that Ground Seven is timely under § 2255(f)(3) because it relates back to the originally filed motion to vacate, which was filed within a year of the ruling in *Ciminelli*. (Doc. No. 754, at 4.)

When a § 2255 motion is considered timely filed, an amended motion may, in some circumstances, "relate back" to the previously filed § 2255 motion as to deem it timely filed. *Mayle v. Felix*, 545 U.S. 644, 664, 125 S. Ct. 2562, 162 L. Ed. 2d 582 (2005) (applying the relation back provision for amendments under Fed. R. Civ. P. 15(c)(2) to habeas petitions). An amended motion to vacate does not relate back (and thereby escape the one-year time limit set forth in § 2255(f)) "when it asserts a new ground for relief supported by facts that differ in both time and type" from those set forth in the original pleading. *Mayle*, 545 U.S. at 650. Stated differently, "relation back depends on the existence of a common 'core of operative facts' uniting the original and newly asserted claims." *Id.* at 659.

Alqsous suggests, without elaboration, that Ground Seven relates back to the original § 2255 motion because "the amended claim arose out of the same ***conduct*** as set forth in the original pleading." (Doc. No. 754, at 4 (emphasis in original).) The Court disagrees. Ground Seven relies on the ruling in *Ciminelli* that rejected the "right to control" theory as a basis for a conviction under

40

the federal wire fraud statute. (Doc. No. 740, at 6 (citing *Ciminelli*, 598 U.S. at 316).) In contrast, the grounds raised in the original § 2255 motion each invoke the Sixth Amendment right to effective assistance of trial counsel. While Ground Seven challenges the jury instructions for fraud in light of *Ciminelli*, the grounds raised in the original petition focus on counsel's efforts associated with pretrial investigation and motion practice, plea negotiations, and trial. Because Ground Seven does not share a common core of operative facts with the ineffective assistance of counsel claims asserted in the original motion, it does not relate back and cannot be considered timely under § 2255(f)(3). *See, e.g., United States v. Clark*, 637 F. App'x 206, 209 (6th Cir. 2016) (district court properly denied motion to amend § 2255 motion because proposed amendment challenging the drug amounts attributed to him at sentencing did not relate back to claims of ineffective assistance of counsel in the original motion). Ground Seven is untimely and is denied for this reason alone.

### C. Procedural Default (Grounds Five through Seven)

The government also argues that Grounds Five through Seven must be dismissed because they are procedurally defaulted. (Doc. No. 747, at 9–19, 24–28.) Alqsous does not dispute that he failed to raise these claims at trial and on direct review. Instead, he argues that his default is excused because the issues raised in these claims are novel.

A § 2255 motion is not a substitute for a direct appeal. *See Ray v. United States*, 721 F.3d 758, 761 (6th Cir. 2013) (quotation marks and citations omitted). "Defendants must assert their claims in the ordinary course of trial and direct appeal." *Grant v. United States*, 72 F.3d 503, 506 (6th Cir. 1996). As such, a § 2255 claim is procedurally defaulted if the petitioner did not raise the claim on direct appeal but could have done so. *See Vanwinkle v. United States*, 645 F.3d 365, 369 (6th Cir. 2011). To obtain review of a procedurally defaulted claim, the petitioner must

demonstrate either cause for the default and actual prejudice or that he is actually innocent. *Vanwinkle*, 645 F.3d at 369 (quotation marks and citation omitted).

One way a petitioner "may establish cause to excuse a procedural default [is] if his claim is so novel that its legal basis was not reasonably available during the original proceedings." *Beasley v. United States*, No. 23-5874, 2024 WL 4493360, at *2 (6th Cir. June 3, 2024) (citing *Mitchell v. United States*, 43 F.4th 608, 615 (6th Cir. 2022)). "A claim is novel where, at the time of the default, the case law necessary to conceive and argue the claim did not yet exist, that is, the movant must have had no reasonable basis upon which to formulate the question now being presented." *Id.* at *2 (citing *Gatewood v. United States*, 979 F.3d 391, 395 (6th Cir. 2020)).

Recognizing that the "novelty standard" is a "high one[,]" *Gatewood*, 979 F.3d at 395 (quoting *Gibbs v. United States*, 655 F.3d 473, 476 (6th Cir. 2011)), the Sixth Circuit has observed that "an 'issue can hardly be novel' if, at the time of the default, 'other defense counsel ha[d] raised the claim." *Id*. (quoting *Cvijetinovic v. Eberlin*, 617 F.3d 833, 837 (6th Cir. 2010)). Put a different way, "[i]f another litigant pressed the claim, the tools required to conceive it must have existed." *Id.* "Even 'the alignment of the circuits against a particular legal argument does not equate to cause for procedurally defaulting it.'" *Id*. (quoting *Cvijetinovic*, 617 F.3d at 839). "'Unless the Supreme Court has decisively foreclosed an argument, declarations of its futility [where the source of the futility is adverse circuit precedent] are premature.'" *Id*. (quoting *Cvijetinovic*, 617 F.3d at 839 n.7).

### 1.  *Claim from Snyder is Defaulted (Ground Five)*

On June 26, 2024, the Supreme Court held that 18 U.S.C. § 666 does not criminalize gratuities accepted for past official acts. *Snyder*, 603 U.S. at 10. In light of *Snyder*, Alqsous takes

issue with the Court's jury instructions explaining that, with respect to the crime of bribery concerning programs receiving federal funds under § 666, "if you find that the agent accepted the payment with the intent to be rewarded for a decision already made, it does not matter that the payment was not accepted or solicited until after the transactions occurred." (Doc. No. 740, at 2 (quoting Doc. No. 360 (Trial Transcript), at 70 (emphasis from motion omitted)).) He maintains that such an instruction criminalized the payment of gratuities under § 666, running afoul of *Snyder*, because Alqsous "was not hired by MetroHealth until *after* Hills had implemented the flex time policy. Accordingly, any payments made by [him] to Hills were *ipso facto* gratuities as they occurred after Hills' official acts[.]"  (*Id*. at 3 (emphasis in original).)

There is no dispute that Alqsous did not raise this issue at trial or on direct appeal. At trial, the only objection counsel made to the § 666 instructions was that, in his opinion, the instructions should have included a requirement that there be a threat to the integrity of the federal program. (Doc. No. 412, at 9–10.) This objection, which the Court rejected, was entirely unrelated to the concern regarding gratuities raised by the Supreme Court in *Snyder*.

Alqsous does not dispute the default but argues "he is excused from having to have raised these claims earlier because they are, in fact, novel." (Doc. No. 754, at 4.) According to Alqsous, "[a]t the time of Dr. Alqsous's trial and on appeal, only the First Circuit in *United States v. Fernandez*, 722 F.3d 1, 26" (1st Cir. 2013) "had held that § 666 only applied to bribes." (*Id*.) He observes that "the Second, Sixth, Seventh, and Eighth Circuits had held to the contrary." (*Id*. (citing, among authority, *United States v. Abbey*, 560 F.3d 513, 520 (6th Cir. 2009)). As already noted, neither "the alignment of the circuits against a particular argument[,]" nor the existence of binding lower court authority to the contrary can serve as an excuse for failing to preserve an

43

argument.[12] *See Gatewood*, 979 F.3d at 396; *see also Bousley v. United States*, 523 U.S. 614, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998) (rejecting cause argument based on binding precedent, noting that "futility cannot constitute cause if it means simply that a claim was unacceptable to that particular court at that particular time" (quotation marks and citation omitted)). Moreover, Alqsous concedes that, at the time of his trial, at least one other defense attorney had argued (and one other circuit had already ruled) consistent with *Snyder* that § 666 criminal liability did not attach to gratuities.[13] Given that other defense counsel had raised the argument, "the tools required to conceive it must have existed." *Gatewood*, 979 F.3d at 395.

Even though the Court need not reach the issue of prejudice, the fact remains that Alqsous also cannot demonstrate that he suffered any actual prejudice associated with the ruling in *Snyder*. While Alqsous claims that the issue raised in *Snyder* is applicable to all bribery counts, the language to which he takes offense only appeared in the instructions for the two charges under § 666 (Counts 3 and 5). As explained above, the Court's jury instructions were separated by count (or groups of counts) and were each tied to a particular scheme. The Court also included charts to further delineate the charges and schemes to which the charges applied. Under these circumstances, there is simply no room for the argument that one sentence in 95 pages of instructions, limited to one particular statute and counts, somehow permeated the entire document and infected the instructions on separate statutes and counts. Further, Counts 3 and 5 involved the

---

[12] And trial counsel was aware of the need to preserve all objections, including those that were against the weight of authority or contrary to binding precedent. In lodging his objection that the instructions failed to include a requirement that the charged bribery pose a threat to the integrity of the federal program, counsel stated, "I realize there is case law that goes against the proposition, but I wanted to preserve it for the record." (Doc. No. 412, at 10.)

[13] By the time the Supreme Court addressed the issue in *Snyder*, the Fifth Circuit had also ruled that § 666 did not criminalize the payment of gratuities. *Snyder*, 603 U.S. at 10 (noting the circuit split and citing, among authority, *United States v. Hamilton*, 46 F.4th 389, 397 (5th Cir. 2022) (holding § 666 does not criminalize gratuities))).

"dental resident bribery" scheme, and not the "stream of benefits" scheme. (Doc. No. 1 (Indictment) ¶¶ 194–261, 272–73; *see* Doc. No. 338, at 5.) The evidence at trial established that Alqsous and his co-conspirators devised the dental resident bribery scheme before any residents were admitted or paid any bribes. As such, Alqsous's argument that the payment for one of the benefits he received in the "stream of benefits" scheme—a flexible schedule—was paid after Hills initiated the policy and therefore constitutes a gratuity that does not impact either § 666 count. *See, e.g., United States v. Quintanilla*, 114 F.4th 453, 478 (5th Cir. 2024) (distinguishing *Snyder* because, "[u]nlike *Snyder*, this is a case about bribes rather than gratuities, and the jury was instructed to that effect"); *United States v. Cui*, No. 19-cr-322, 2024 WL 3848513, at *13 (N.D. Ill. Aug. 16, 2024) (distinguishing *Snyder* where the evidence supported a bribery scheme, and not the payment of gratuities); *see also Snyder*, 603 U.S. at 19 (noting that the "timing of the agreement is the key, not the timing of the payment").

Accordingly, the Court finds that Ground Five can also be denied because it is procedurally defaulted.

### 2. *Claim from Fischer is Procedurally Defaulted (Ground Six)*

In Count 29, Alqsous, along with co-defendants Hills and Al-Madani, were charged with conspiracy to obstruct justice, in violation of 18 U.S.C. § 1512(k). (Doc. No. 1 (Indictment), at 83.) In *Fischer* (issued June 28, 2024), the Supreme Court held that Section 1512(c)(2)—which renders it unlawful to "otherwise obstruct[], influence[], or impede[] any official proceeding, or attempt[] to do so"—requires the government to prove that the defendant's conduct "impaired the availability or integrity for use in an official proceeding of records, documents, objects, or . . . other things used in the proceeding, or attempted to do so." *Fischer*, 603 U.S. at 498; *see* 18 U.S.C.

45

§ 1512(c)(2). According to Alqsous, the Court's jury instructions on this charge violated *Fischer* because "the instructions did not require the jury to find that Dr. Alqsous manipulated any tangible thing." (Doc. No. 740, at 5.)

Alqsous failed to raise this challenge at trial or on appeal. At trial, counsel raised two objections to the Court's obstruction instructions. First, counsel argued that the jury should have been instructed that they must find that the "the communications were reasonably likely to reach a federal officer[.]" (Doc. No. 412, at 10.) Second, in a related objection, counsel argued that the jury should have been advised that "the defendant has to have an intent to obstruct a federal grand jury in the Northern District of Ohio[,]" not just that he "intends to obstruct generally[.]" (*Id.* at 11.) Neither objection touches upon the issue raised in *Fischer*.

Alqsous again turns to the "novelty" argument to excuse his default, suggesting that the issue was obviously novel when announced in *Fischer*. (Doc. No. 754, at 4.) "After all," Alqsous observes, *Fischer* "arose out of the prosecution of the January 6 defendants and the president of the United States." (*Id.*) Yet there was no impediment, such as a contrary Supreme Court decision, to trial counsel raising the issue before *Fischer*. In fact, long before the prosecution of the individuals involved in events at the United States Capitol on January 6, 2021, defendants had argued that § 1512(c)(2) should be limited to tampering with physical evidence. *See, e.g., United States v. Petruk*, 781 F.3d 438, 446–47 (8th Cir. 2015) (rejecting defendant's argument that § 1512(c)(2) was "limited to obstruction involving documents or physical evidence"); *United States v. De Bruhl-Daniels*, 491 F. Supp. 3d 237, 250–52 (S.D. Tex. 2020) (rejecting argument that "tampering with tangible evidence is an essential element of a § 1512(c)(2) violation" and collecting cases nationwide from as early as 2006 addressing the issue). The Court finds no cause

to excuse the default.

In any event, Alqsous has failed to establish that he was actually prejudiced by the Court's jury instructions on obstruction. Alqsous acknowledges that the Indictment charged that he, in particular, caused the issuance of a false Form 1099 to Hills to mislead investigators into believing that bribe monies received by Hills were actually wages (*see* Doc. No. 1, at 88 ¶ 359). The Court in *Fischer* made clear that § 1512(c)(2) still covers "creating false evidence[.]" *Fischer*, 603 U.S. at 491; *see also United States v. Riley*, 115 F.4th 604, 614 (D.C. Cir. 2024) ("destroying evidence pertinent to a grand jury investigation—is exactly the type of conduct [post-*Fischer*] covered by Section 1512(c)"). In addition to evidence regarding the fabrication of a Form 1099, the jury heard testimony that "Al-Madani warned Karadsheh [(a dental resident who was solicited for bribe payments)] to stay quiet about the bribe he had paid or risk deportation[;]" that Hills told Elrawy to "downplay" the resident bribery scheme when he spoke with the FBI; that "[b]efore Joyce Kennedy appeared before the grand jury, Hills told her to 'just forget about' the envelopes of cash she had seen [being given to Hills at dinners by Alqsous, Al-Madani, and Elrawy;]" and Hills instructed Al-Madani and Elrawy to "'stick together' and not to talk to the FBI[.]" *Hills*, 27 F.4th at 1185–86. Such conduct still qualifies as obstruction under § 1512(c)(2) and *Fischer*, since it involves impairing the availability of a witness or intangible information in a federal investigation. *See Fischer*, 603 U.S. at 491 (noting that § 1512(c)(2) still imposes liability for "impairing the availability or integrity of *other* things . . . such as witness testimony or intangible information." (emphasis in original) (citation omitted)).

### 3. Claim from Ciminelli is Procedurally Defaulted (Ground Seven)

In Ground Seven, Alqsous claims that his fraud convictions in Counts 4, 8, and 28 have

been invalidated by the Supreme Court's 2023 decision *Ciminelli*, inasmuch "as the jury was permitted to find Dr. Alqsous guilty under a right-to-control theory." (Doc. No. 740, at 7.) He argues that the Court's jury instructions permitted the jury to convict him of fraud "solely on the concealing of material information, which is the hallmark of the right-to-control theory—or, as the Sixth Circuit frames it, 'the right to accurate information.'" (*Id*. at 6 (quoting *United States v. Bolos*, 104 F.4th 562, 570 (6th Cir. 2024)).

The government maintains that this ground is, in addition to being time-barred, procedurally defaulted. (Doc. No. 747, at 20, 24–27.) Alqsous argues that he meets the cause and prejudice standard for excusing his default because "*Ciminelli* also was novel as it was not reasonably available to counsel." (Doc. No. 754, at 5.) He reasons that "*Ciminelli* pertained exclusively to the Second Circuit's right to control theory of fraud." (*Id*.) While it may be true that the Supreme Court accepted certiorari to address the Second Circuit's right to control theory, *see Ciminelli*, 598 U.S. at 308, the Court's holding that "property" in traditional wire or mail fraud only includes "traditional property interests," and therefore does not include the deprivation of intangible property interests such as "potentially valuable economic information . . . necessary to make discretionary economic decisions," was an argument that was reasonably available to counsel prior to trial in this case. Moreover, the fact that litigants and courts within the Second Circuit were grappling with the question of whether valuable economic information satisfies the property interest in traditional property wire fraud means that the legal tools existed to advance such an argument. *See, e.g., United States v. Binday*, 804 F.3d 558, 569–70 (2d Cir. 2015) (rejecting defendant's argument that deprivation of potentially valuable information does not satisfy the property interest in wire fraud); *United States v. Viloski*, 557 F. App'x 28, 32–33 (2d

Cir. 2014) (rejecting argument that information about a corporate officer's self-dealing did not constitute "property" for purposes of § 1341); *United States v. Gatto*, 295 F. Supp. 3d 336, 344 (S.D. N.Y. 2018) (defendant argued unsuccessfully that a wire fraud charge required an allegation that defendant obtained money or property). Alqsous has failed to demonstrate cause for his default.

Alqsous has also failed to demonstrate actual prejudice. As the government correctly observes, *Ciminelli* has no bearing on Alqsous's fraud convictions in Counts 4, 8, and 28. (Doc. No. 747, at 25.) Counts 4 and 28 charged a conspiracy to commit honest services fraud under 18 U.S.C. § 1346, not a conspiracy to commit traditional property or money fraud under 18 U.S.C. §§ 1341 or 1343. (Doc. No. 1 ¶¶ 262–70, 335–40; *see* Doc. No. 338, at 4, 21.) The Court in *Ciminelli* explained that the crime of honest services fraud under § 1346 involves a different statute with different language than traditional mail or wire fraud under §§ 1341 and 1343, and is, therefore, outside the scope of its holding. *Ciminelli*, 598 U.S. at 313 (explaining that Congress "amended the fraud statutes 'specifically to cover one of the 'intangible rights' that lower courts had protected under [the statutes] prior to *McNally*:[14] 'the intangible right of honest services.''" (quoting *Cleveland v. United States*, 531 U.S. 12, 19–20, 121 S. Ct. 365, 148 L. Ed. 2d 221 (2000) (further quotation omitted))); *see, e.g., United States v. Quintanilla*, 114 F.4th 453, 471 (5th Cir. 2024) (holding that "*Ciminelli* concerned the right to control, not the intangible right to honest services, which it contrasts with the right to control" (citing *Ciminelli*, 598 U.S. at 314)); *United States v. Avenatti*, 81 F.4th 171 n.27 (2d Cir. 2023) ("At issue in *Ciminelli* was traditional, not

---

[14] In *United States v. McNally*, 483 U.S. 350, 360, 107 S. Ct. 2875, 97 L. Ed. 2d 292 (1987), the Supreme Court held that federal fraud statutes were limited to the protection of individual property rights.

honest-services fraud. Thus, [*Ciminelli's*] rejection of a 'right-to-control theory' of 'property' for purposes of satisfying the loss-of-property element of traditional fraud has no bearing on Avenatti's sufficiency challenge to his conviction for honest-services fraud").[15]

The ruling in *Ciminelli* also has no bearing on Alqsous's conviction for Count 8, which charged a conspiracy to commit traditional money and property wire or mail fraud, based on the OHE scheme, wherein Hills, Alqsous, and Al-Madani secretly used MetroHealth's resources (including the hospital's facilities and employees) to operate Hills's for-profit dental remediation program. (*See* Doc. No. 338, at 8.)  At trial, the jury heard evidence regarding how the OHE scheme involved depriving MetroHealth of tangible property items, such as money, dental chairs, instruction books, and employee time. *See Hills*, 27 F.4th at 1183 (identifying these traditional property interests and their monetary values). Accordingly, the OHE scheme, which involved traditional and tangible property, is far different from the fraud scheme in *Ciminelli*, which involved the intangible right to "potentially valuable economic information that it would consider valuable in deciding how to use its assets." *Ciminelli*, 598 U.S. at 311 (citation omitted); *see, e.g.*, *United States v. Shetty*, No. 2:23-cr-84, 2025 WL 296457, at *1, 5 (W.D. Wash. Jan. 24, 2025) (distinguishing *Ciminelli* on grounds that the charged fraudulent scheme deprived the victim of a traditional property interest—35 million dollars); *United States v. Filer*, No. 19-cr-565, 2025 WL 81351, at *3, 5 (N.D. Ill. Jan. 13, 2025) (distinguishing *Ciminelli* because the present indictment

---

[15] Alqsous observes that the companion case to *Ciminelli*, *Percoco v. United States*, involved honest services fraud. (Doc. No. 754, at 5.) But *Percoco* addressed the question of "whether a private citizen with influence over government decision-making can be convicted of wire fraud on the theory that he or she deprived the public of its 'intangible right of honest services.'" 598 U.S. 319, 322, 143 S. Ct. 1130, 215 L. Ed. 2d 305 (2023) (quoting 18 U.S.C. §§ 1343, 1346). The Supreme Court ruled that the district court's jury instructions—directing the jury to consider whether a defendant had a "special relationship" with the government and "dominated and controlled" government business—did not supply the proper test for determining whether a private person may be convicted of honest services fraud. *Id.* Because Alqsous and his co-defendants were public officials, the ruling in *Percoco* finds no application in this case.

50

charged that traditional property interests—the right to be paid money—were at issue in the bank fraud).

Because Alqsous can demonstrate neither cause for the default nor actual prejudice, Count Seven is denied for the additional reason that it is procedurally defaulted.

### D.  *Loper Bright* does not Require Resentencing (Ground Eight)

In Ground Eight, Alqsous argues, without elaboration, that the Court "repeatedly referenced and deferred to the commentary to the U.S. Sentencing Guidelines when calculating the advisory sentencing range." (Doc. No. 740, at 7 (citing Doc. No. 539 (Transcript of Alqsous Sentencing Hearing), at 12–14, 33).[16]) According to Alqsous, this violates the Supreme Court's subsequent ruling in *Loper Bright* because "[c]ourts must now 'exercise their independent judgment in deciding whether [the Commission] has acted within its statutory authority' in promulgating the Guidelines in whole and in part, and '*ensur[e]* that the [Commission] has acted within it[s statutory authority].'" (*Id*. at 8 (quoting *Loper Bright*, 603 U.S. at 412 (alterations and emphasis added by Alqsous)).) He insists that *de novo* resentencing is required for the Court to exercise its independent judgment and/or make findings as to whether any part of the Sentencing Guidelines are ambiguous before referring to the commentary. (*Id*. at 9.)

Initially, the government argues that Alqsous may not apply the procedural rule announced in *Loper Bright* retroactively to his case. (Doc. No. 747, at 28.) Under *Teague v. Lane*, a "new rule" of criminal procedure does not apply retroactively to cases proceeding on collateral habeas review unless the rule either decriminalizes a class of conduct or is a "watershed" rule that

---

[16] Alqsous's amended motion cites Doc. No. 139, the transcript from Hills's conflict hearing, instead of Doc. No. 539. The Court assumes this was a typographical error.

implicates the fundamental fairness and accuracy of a criminal proceeding. *Saffle v. Parks*, 494 U.S. 484, 494–95, 110 S. Ct. 1257, 108 L. Ed. 2d 415 (1990) (citing ', 489 U.S. 288, 311, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989)). The procedural rule in *Loper Bright* did not decriminalize a class of conduct, or represent a "watershed" rule, as review of the Sentencing Guidelines' commentary does not implicate "the observance of those procedures that . . . are implicit in the concept of ordered liberty." *See Teague*, 489 U.S. at 307 (quotation marks and citation omitted). Moreover, the Supreme Court was clear that it did not intend for its decision in *Loper Bright* to be retroactive. 603 U.S. at 376, 412 ("[W]e do not call into question prior cases that relied on the *Chevron* framework. The holdings of those cases that specific agency actions are lawful . . . are still subject to statutory *stare decisis* despite [the Supreme] Court's change in interpretative methodology." (citation omitted)). Accordingly, even if *Loper Bright* were properly applied to a district court's use of the commentary to the Sentencing Guidelines (which, as will be explained, it is not), Alqsous could not take advantage of the ruling on collateral review. *See generally Lang v. United States*, 474 F.3d 348, 357 (6th Cir. 2007) (refusing to apply the procedural rule in *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005)), which rendered the Sentencing Guidelines advisory, retroactively on habeas review); *see, e.g., Black Farmers & Agriculturalists Assoc., Inc. v. Vilsack*, No. 2:23-cv-2527, 2024 WL 4571446, at *1 n.2 (W.D. Tenn. Oct. 24, 2024) (finding the holding in *Loper Bright* was a new procedural rule that could not be applied retroactively).

Even if the Court were permitted to reach the merits of Ground Eight it would still fail. In *Loper Bright*, the Supreme Court struck down "*Chevron* deference," which required courts to defer to an agency's permissible construction of an ambiguous statute. *See Loper Bright*, 603 U.S. at

379–80 (citing *Chevron*, 467 U.S. at 843). "*Loper Bright* said nothing about deference to an agency interpretation of a regulation." *United States v. Kukoyi*, 126 F.4th 806, 817 (2d Cir. 2025) (Menashi, J. concurring in part). The Supreme Court has said that the commentary to the Sentencing Guidelines "is akin to an agency's interpretation of its own legislative rules." *Stinson v. United States*, 508 U.S. 36, 45, 113 S. Ct. 1913, 123 L. Ed. 2d 598 (1993). As a result, since 2019, courts have applied *Kisor v. Wilkie*, 588 U.S. 558, 139 S. Ct. 2400, 204 L. Ed. 2d 841 (2019), to determine whether to defer to the commentary's interpretation of a Sentencing Guideline. *See, e.g., United States v. Smith*, 79 F.4th 790, 798 (6th Cir. 2023) (applying *Kisor*); *United States v. Riccardi*, 989 F.3d 476, 480 (6th Cir. 2021) (similar).

After *Loper Bright*, courts including the Sixth Circuit have continued to employ *Kisor* to guide their consideration of the commentary to the Sentencing Guidelines. *See Kukoyi*, 126 F.4th at 817 (Menashi, J. concurring in part) (noting that "*Loper Bright* does not implicate *Stinson*"); *United States v. McIntosh*, 124 F.4th 199, 205 n.3 (3d Cir. 2024) (observing that since *Loper Bright*, courts "have continued to defer to the Commission's commentary under *Kisor*" and collecting cases); *United States v. Charles*, Nos. 22-5424/5427, 2024 WL 4554806, at *13 (6th Cir. Oct. 23, 2024) (assuming that the analytical framework from *Kisor* for considering the Sentencing Guidelines was not disturbed by *Loper Bright*); *see also United States v. Durio*, No. 19-cr-150, 2024 WL 3791225, at *4  (E.D. La. Aug. 13, 2024) (refusing to apply *Loper Bright* to sentencing argument in § 2255 motion). Because the ruling in *Loper Bright* is inapplicable to Alqsous's sentencing, Ground Eight is entirely without merit and must be denied.

To the extent that Ground Eight relies on the Supreme Court's ruling in *Kisor* (*see* Doc. No. 740, at 9 (citing *Kisor*, *supra*)), which was decided on June 26, 2019, it is procedurally

defaulted (as it was not raised on direct appeal), clearly time-barred under 28 U.S.C. § 2255(f)(3), and not cognizable on habeas review. *See generally Snider v. United States*, 908 F.3d 183, 189 (6th Cir. 2018) (non-constitutional challenges to the Sentencing Guidelines are not cognizable on a § 2255 motion (citations omitted)). Even without these impediments to review, however, this final ground for relief would still be denied because it fails to state a viable claim. A petitioner bears the burden of articulating sufficient facts to state a viable claim for relief under § 2255. Vague and conclusory claims that are not substantiated by allegations of specific facts with some probability of verity are not enough to warrant relief. *McFarland v. Scott*, 512 U.S. 849, 856, 114 S. Ct. 2568, 129 L. Ed. 2d 666 (1994) (A § 2255 motion that fails to state the supporting facts is legally insufficient on its face and may be dismissed.) A § 2255 motion may be dismissed if it only makes conclusory statements without substantiating allegations of specific facts. *Green*, 454 F.2d at 53; *O'Malley*, 285 F.2d at 735. Here, Alqsous merely alleges, in a perfunctory manner, that the Court improperly relied on the commentary without demonstrating the impropriety of the Court's actions or the negative impact any such action may have had on his sentence. It is well-settled that perfunctory and undeveloped arguments, "unaccompanied by some effort at developed argumentation[,]" are waived. *Thomas v. United States*, 849 F.3d 669, 679 (6th Cir. 2017) (citation omitted); *see United States v. Sandridge*, 385 F.3d 1032, 1035–36 (6th Cir. 2004) (similar) (quotation marks and citation omitted); *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court . . . to put flesh on its bones." (quotation marks and citations omitted)).

For all of these reasons, Ground Eight is denied.

## V.     CONCLUSION

For the foregoing reasons, Alqsous's motion to vacate, set aside, or correct his sentence (Doc. No. 681) is denied. Further, the Court has detailed above how Alqsous's claims of ineffective assistance of counsel are without merit and are belied by the record such that "reasonable jurists" would not debate the Court's denial of Alqsous's motion to vacate. *See Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000). Accordingly, the Court certifies that an appeal from this decision could not be taken in good faith, and that there is no basis upon which to issue a certificate of appealability. 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

Additionally, Alqsous's amended motion to vacate, set aside, or correct his sentence (Doc. No. 740) is denied. For the reasons discussed herein, the Court concludes that "jurists of reason" would not find it "debatable whether the petition states a valid claim of the denial of a constitutional right" or that the Court's findings that these claims are either time-barred, procedurally defaulted, not cognizable on collateral review, or alluded to in a perfunctory manner, thus precluding further review, are "correct[.]" *See Slack*, 529 U.S. at 484. Nor would "jurists of reason" disagree with the Court's findings that, in some instances, the grounds for relief suffer from more than one of these (and other) deficiencies. Accordingly, the Court certifies that an appeal from this decision could not be taken in good faith, and that there is no basis upon which to issue a certificate of appealability. 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

**IT IS SO ORDERED**.

Dated: March 24, 2025

_____
**HONORABLE SARA LIOI**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**